Edward WASKO, Petitioner–Appellant,

v.

Harry K. SINGLETARY as Secretary, Department of Corrections, State of Florida, Respondent–Appellee.

No. 91–5346.

United States Court of Appeals, Eleventh Circuit.

July 22, 1992.

Elliot H. Scherker, Asst. Public Defender, Miami, Fla., for petitioner-appellant.

Julie Thornton, Asst. Atty. Gen., Miami, Fla., for respondent-appellee.

Before FAY, Circuit Judge, CLARK* and DYER, Senior Circuit Judges.

CLARK, Senior Circuit Judge:

This is an appeal from the denial of a state prisoner's petition for writ of habeas corpus, 28 U.S.C. § 2254. The petitioner, Edward Wasko, contends that his murder conviction is unconstitutional because his sixth amendment right to confront witnesses against him was violated when the trial court declined to permit him to cross-examine his codefendant concerning a plea arrangement with the state. The district court concluded that Wasko's sixth amendment right to confront witnesses was violated but that the error was harmless; accordingly, the district court denied the petition. 761 F.Supp. 1560. We find that the district court applied an erroneous harmless error standard. Nevertheless, applying the correct legal standard, we conclude that the constitutional error, if any, was harmless beyond a reasonable doubt. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 14, 1982, a 10-year-old girl was found beaten and shot in her bed in a neighborhood in North Miami Beach, Florida. Police detectives discovered that a Stanley Steemer truck had been in the neighborhood cleaning carpets on the afternoon of the murder. Eddie Wasko and John Pierson were the employees working out of the truck. Both men were interviewed by police and agreed to give blood samples. In this first interview with police, Wasko gave a sworn statement regarding his and Pierson's activities on the afternoon of the murder. He stated that he spent about 30 minutes fixing the truck, that during this time he sent Pierson out to hand out advertisements, that Pierson was out of his sight for at most 10 minutes, and that he did not notice anything different about Pierson's appearance when he returned to the truck. Wasko also stated that he did not own any guns.

During the investigation of the murder, detectives found that bloodstains from the crime scene matched Pierson's blood type and were consistent with Pierson's blood enzyme and protein types. Detectives also discovered that Wasko had made statements to third parties that were inconsistent with the statement he gave police. Specifically, Wasko told his roommate that the police thought Pierson committed a murder and that Pierson had returned from handing out advertisements with blood on his hands. Wasko told Stanley Steemer's corporate counsel that Pierson had returned from distributing advertisements with a "disheveled, messed up" appearance and that he had scratches on his arms. Finally, Wasko told one of his co-workers that Pierson was accusing him of carrying a gun under his seat. This co-worker told police that Pierson had approached Wasko and him as they were sitting in their truck at a stop light and had told Wasko that he did not tell the police about the gun under the seat.

In July 1983, after police discovered these discrepancies between what Wasko had told third persons and what he had told police, two police detectives traveled to Ohio, where Wasko was living,[1] to interview him. At this point in the investigation, police viewed Wasko as a valuable witness against Pierson, but not as a suspect. Nevertheless, the interview in Ohio,

---

* See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

1. At some point during the investigation of the murder, Wasko moved from Miami back to his native Ohio.

which took place over a period of approximately 60 hours, culminated in Wasko's confession to the murder.

The interview began on Wednesday afternoon, July 6, 1983, at about 6:00 p.m. when the detectives met Wasko, who had just completed his work shift, at the Stanley Steemer headquarters in Columbus, Ohio. Wasko voluntarily accompanied the detectives to a local police headquarters. During this Wednesday evening interview, Wasko gave different accounts of what occurred on October 14, 1982, none of them inculpatory. The detectives returned Wasko to Stanley Steemer headquarters, where he was living at the time, at approximately 9:00 p.m., with an agreement that questioning would resume on Thursday.

The detectives picked up Wasko at approximately 10:00 a.m. on Thursday and again took him to a local police headquarters. There, a polygraph examiner questioned him until approximately 9:00 p.m., when he was taken back to Stanley Steemer headquarters. During this Thursday interview, Wasko again gave several different accounts of what occurred, none of them inculpatory. Questioning resumed shortly after noon the next day, which was Friday. The polygraph examiner and the detectives questioned Wasko through the day, evening, and into the early hours of the following morning. Between 1:30 a.m. and 2:30 a.m. on Saturday morning, Wasko gave the tape-recorded confession that was the state's primary piece of evidence against him at trial. According to this confession, both Wasko and Pierson participated in the murder.

Prior to Wasko's trial, Pierson pled guilty to second-degree murder and received a 17 year sentence. This sentence was not subject to parole. In exchange for Pierson's plea, the state dismissed a rape charge against Pierson arising out of an incident with his ex-fiancée that occurred after the murder. In addition, as a condition of his plea, Pierson agreed to testify truthfully should the state call him as a witness at Wasko's trial.

2. Trial Transcript Vol. VIII at 1620.

At Wasko's trial, the state relied almost exclusively on Wasko's confession. There was no physical evidence to link Wasko with the scene of the crime, and the state did not call Pierson to testify. The state did, however, rely on two pieces of evidence to support to veracity of Wasko's confession. First, the state established through the testimony of the customers whom Wasko and Pierson had serviced on October 14, 1982, that there had been a two and one-half hour gap in their work activities on that afternoon. Second, the detectives and the polygraph examiner testified that, during his confession and the questioning leading up to the confession, Wasko told them information that he could have known only if he had been present at the scene of the crime.

Wasko's defense at trial was that Pierson had committed the murder alone while Wasko was fixing the truck and that Wasko had been psychologically coerced into confessing to the crime. To undermine the reliability of Wasko's confession, the defense introduced independent evidence inconsistent with the version of events related by Wasko in his confession. For example, the defense introduced evidence that the 10-year-old victim would not have acted in the seductive manner that Wasko represented in his confession. The defense also vigorously attacked the voluntariness of the confession. Wasko testified in his own defense, explaining the confession as follows:

> After many hours of putting a defeated attitude in me and putting in a lot of guilt in my mind, and actually telling me what to say, the statement was made.[2]

To explain his knowledge of the crime scene, Wasko testified that the detectives had told him what to say during his confession. Thus, according to Wasko, the testimony of the two detectives and the polygraph examiner as to the confession and the events surrounding the confession was false. As to the events of October 14, 1982, Wasko testified that he did not know Pierson's whereabouts for a period of time during the afternoon prior to his discovery

that the truck was broken, that he had sent Pierson to hand out advertisements while he fixed the truck, and that Pierson had returned to the truck looking disheveled and with a dark spot on his red shirt. The state impeached Wasko with his first sworn statement to detectives, in which he had said that there was nothing unusual about Pierson's appearance when he returned to the truck. Wasko explained that he remembered the disheveled appearance and dark spot only later, after he realized their significance.

The defense also called Pierson. According to Pierson, Wasko was solely responsible for the murder. Specifically, Pierson testified that he had witnessed Wasko assaulting the girl in the bedroom where her body was found, that he had tried unsuccessfully to save her, and that he did not tell police this story during initial interviews because Wasko had threatened to kill him if he did not keep quiet. At defense counsel's request, the trial court declared Pierson an adverse witness. The court declined, however, to permit defense counsel to question Pierson regarding the terms of his plea agreement with the state. The trial court also declined to permit defense counsel to elicit facts regarding the dismissed rape charge under the theory that it was a similar crime. Thus, defense counsel elicited only that Pierson had pled guilty. Defense counsel also impeached Pierson with prior inconsistent statements and with evidence that the bloodstains at the crime scene that matched Pierson's blood type were not consistent with his version of the events.

During closing argument, the state specifically declined to vouch for Pierson's testimony. Rather, the state took the position that Pierson and Wasko were "partners in crime." The defense took the position that Pierson had committed the murder while Wasko was fixing the truck and that the detectives who interviewed Wasko in Ohio had obtained his confession because they were predisposed to his guilt. The jury convicted Wasko of first-degree murder.

The same jury heard the sentencing phase of Wasko's trial. During this phase, the defense again called Pierson as a witness, but, unlike the guilt phase, the trial court permitted the defense to cross-examine Pierson regarding his plea arrangement with the state. Thus, the defense established that, in exchange for Pierson's guilty plea on the murder charge, the state dismissed the rape charge arising out of the incident with Pierson's ex-fiancée. The defense did not establish, however, either that, as a condition of his plea, Pierson agreed to testify truthfully should the state call him as a witness or that Pierson hoped for favorable treatment from the state as a result of his testimony.

At the close of the sentencing phase, the jury recommended a life sentence. The trial court overrode the jury's recommendation and sentenced Wasko to death. The Supreme Court of Florida affirmed Wasko's conviction but vacated the death sentence and remanded the case for the imposition of a sentence of life imprisonment with no possibility of parole for 25 years. *Wasko v. State*, 505 So.2d 1314 (Fla.1987).

Wasko then filed this habeas petition raising one issue: whether his sixth amendment right to confront witnesses against him was violated when the trial court declined to permit him to question Pierson concerning his plea arrangement with the state. The district court concluded that Pierson's plea agreement was sufficiently relevant to his bias that its exclusion violated Wasko's rights under the Confrontation Clause. The court noted that, although Pierson had already been sentenced and technically was not testifying in fulfillment of his obligations under the plea agreement, he nevertheless could have believed that he had a continuing obligation to testify in a manner favorable to the prosecution. The court further determined that allowing Wasko to impeach Pierson with facts other than the plea agreement did not cure the constitutional violation. The court finally determined, however, that the violation was harmless error, reasoning that Pierson's testimony was entirely unimportant to the state's case and was impeached through cross-examination. The district court denied Wasko's petition, and Wasko appealed.

## II. DISCUSSION

■ A defendant's sixth amendment right to confront adverse witnesses includes the opportunity for effective cross-examination.[3] As the Supreme Court has said, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."[4] Thus, when a witness is in government custody, "it is proper to ask if his testimony is given under the promise or expectation of favorable treatment in his own criminal matter [and] ... error to prevent cross examination of the witness' possible motive to shade his testimony to please state authorities."[5]

■ The sixth amendment right to cross-examination is not strictly limited to the confrontation of witnesses called by the state; it also extends to defense witnesses who testify adversely to the defendant.[6] However, the sixth amendment only protects cross-examination that is *relevant;*[7] thus, for cross-examination regarding a witness' plea agreement with the state to warrant sixth amendment protection, the plea agreement must be relevant to the witness' motive for testifying. In making this relevancy determination, courts consider two factors. First, they consider whether the state in fact may influence the witness' future custody.[8] Second, courts consider the witness' *understanding* of what the state may do for him or her:

[The sixth amendment right to confrontation] is especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government.... Indeed, it is so important that the defendant is allowed to 'search' for a deal between the government and the witness, even if there is no hard evidence that such a deal exists.... *What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists.*[9]

This case is somewhat unusual in that Pierson had already been sentenced at the time he testified against Wasko. Thus, the state was not in fact in a position to influence Pierson's future custody, especially considering that Pierson's sentence did not allow for parole. Moreover, it is unlikely that Pierson harbored any hopes that his testimony would lead to any favorable treatment. First, Pierson was called as a witness for the defense, not the state. Accordingly, he presumably was aware that his testimony was not crucial to the state's case. Second, in his testimony, Pierson portrayed himself as an innocent bystander to the crime. This testimony was inconsistent with the state's theory of the case. Had Pierson decided to falsify his testimony in hopes of favorable treatment from the state, he likely would have created a story more in line with the state's theory that both he and Wasko were culpable. Third, during the sentencing phase of the trial, when the trial court permitted the defense to cross-examine Pierson regarding his plea agreement, the defense did not elicit any testimony to indicate that Pierson hoped for favorable treatment from the state. Thus, cross-examination of Pierson regarding his plea arrangement with the

---

3. *McKinzy v. Wainwright,* 719 F.2d 1525, 1528 (11th Cir.1983) (citations omitted).

4. *Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

5. *McKinzy,* 719 F.2d at 1528.

6. *See Chambers v. Mississippi,* 410 U.S. 284, 297–98, 93 S.Ct. 1038, 1046–47, 35 L.Ed.2d 297 (1973).

7. *See, e.g., McKinzy,* 719 F.2d at 1529.

8. *See McKinzy,* 719 F.2d at 1529 (case remanded because court did "not know from the record whether any state agency still had discretion in the disposition or continued custody of the ... witness").

9. *United States v. Mayer,* 556 F.2d 245, 249 (5th Cir.1977) (quoting *United States v. Onori,* 535 F.2d 938, 945 (5th Cir.1976)). *See also United States v. Lankford,* 955 F.2d 1545, 1548 (11th Cir.1992) (noting that witness' desire to cooperate with prosecution "may be formed beneath the conscious level") (quoting *Burr v. Sullivan,* 618 F.2d 583, 587 (9th Cir.1980)); *Brown v. Dugger,* 831 F.2d 1547, 1556 (11th Cir.1987) (Clark, J., concurring) (whether a deal exists is not crucial; "[w]hat is important is the possibility that a witness is accusing an individual in an effort to please the prosecution").

state, if relevant to his motive, was only marginally so. Nevertheless, because this is a close question, we pretermit resolution of the constitutional question. We assume, without deciding, that there was a violation of Wasko's sixth amendment right, and we move to the harmless error analysis.

■ The district court articulated the following test in its harmless error analysis:

The Court's inquiry does not end with a finding of constitutional error, as the improper denial of a defendant's opportunity to impeach a witness for bias is subject to the harmless error rule of *Chapman v. California*, [386 U.S. 18,] 87 S.Ct. 824 [17 L.Ed.2d 705] (1967). *See Delaware v. Van Arsdall*, [475 U.S. at 684,] 106 S.Ct. at 1438. To determine whether a confrontation violation is harmless error, a court must analyze five factors: 1) the importance of the witness' testimony to the prosecutor's case; 2) whether the testimony was cumulative; 3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; 4) the extent of cross-examination otherwise permitted; and 5) the overall strength of the prosecution's case. *Id.* Also, an assessment of harmlessness cannot include consideration of whether "the jury's assessment [would have been] unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *Coy v. Iowa*, [487 U.S. 1012,] 108 S.Ct. 2798, 2803 (1988).[10]

The first part of this test is an accurate recitation of the five factors identified by the Supreme Court in *Delaware v. Van Arsdall*[11] as relevant to a harmless error inquiry. The second part of the test, however, is an erroneous statement of the law; specifically, the district court erred in incor-porating the language of *Coy v. Iowa*[12] into the harmless error analysis applicable to the constitutionally improper denial of a defendant's opportunity to cross-examine a witness.

*Coy*, like this case, involved a violation of the Confrontation Clause; however, *Coy* involved the denial of face-to-face confrontation, not the denial of cross-examination. The defendant in *Coy* was tried with a large screen separating him and his accusers, such that, during their testimony, he could not see them and they could not see him. The Supreme Court held that this practice violated the Confrontation Clause, specifically, "the right to face-to-face confrontation," as opposed to "a less explicit component of the Confrontation Clause ...—the right to cross-examine the accuser."[13] The Court also held that the denial of face-to-face confrontation, like other types of violations of the Confrontation Clause, was subject to the harmless error standard of *Chapman v. California*.[14] In so holding, the Court noted:

An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.[15]

Although the Supreme Court in *Coy* did not explicitly limit application of this language to cases involving the denial of face-to-face confrontation, it also did not indicate any intention to extend application of the language to any situation other than the denial of face-to-face confrontation. Indeed, while this language is suited to a harmless error analysis of the denial of face-to-face confrontation, it is *not* suited to the harmless error analysis of the denial of cross-

**10.** 761 F.Supp. at 1568.

**11.** *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

**12.** *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

**13.** *Id.* at 1019–20, 108 S.Ct. at 2802.

**14.** *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**15.** *Coy v. Iowa*, 487 U.S. at 1021–22, 108 S.Ct. at 2803.

examination. The Supreme Court made this clear in *Olden v. Kentucky,*[16] which was decided approximately six months after *Coy. Olden,* like this case, involved the denial of cross-examination. The Supreme Court, without mentioning *Coy,* applied the harmless error test articulated in *Van Arsdall:*

> "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."[17]

Thus, it is this test, and not the language of *Coy,* that must be applied to determine whether the denial of cross-examination is harmless.

 Although the district court in this case applied an erroneous harmless error standard, its decision may nevertheless be upheld under the proper standard. Applying the *Van Arsdall* test quoted above, the question is whether, assuming the damaging potential of the evidence regarding Pierson's plea agreement with the state could have been fully realized, the exclusion of this evidence was harmless beyond a reasonable doubt.

There is no doubt this was a close case. Nevertheless, we are convinced that the exclusion of the impeaching evidence was harmless error. First, as discussed above, Pierson's plea arrangement with the state was, at most, only marginally relevant to his bias or motive. Indeed, during the sentencing phase, the defense did not elicit any testimony from Pierson to indicate that he hoped for favorable treatment from the state. Second, the success of the defense turned on Wasko's ability to convince the jury that his confession was coerced and, therefore, involuntary. Pierson's testimony was relevant only to the truthfulness of the content of the confession; it was not relevant to whether the confession was voluntary. The jury heard all relevant evidence on the voluntariness of the confession and concluded that it was voluntary. Third, Pierson's testimony was far from

central to the state's case. Indeed, Pierson was called by the defense, not the state, and both the defense and the state discredited his testimony. Accordingly, it is highly unlikely that the jury found Pierson's testimony credible even without impeachment regarding his plea agreement with the state. We conclude, therefore, that the exclusion of evidence regarding Pierson's plea agreement was harmless beyond a reasonable doubt.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the petition for writ of habeas corpus.

---

**16.** *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988).

**17.** *Id.* at 231, 109 S.Ct. at 483.