UNITED STATES, Appellee,

v.

Sergeant First Class Stephen W. BLACK, Sr., 456–25–0592, United States Army, Appellant.

ARMY 9301476.

U.S. Army Court of Criminal Appeals.

31 March 1995.

Reconsideration Denied 26 April 1995.

For Appellant: Jack B. Zimmermann (argued); Michael C. Gross, Captain Don F. Pollack, JAGC (on brief); Major Roy H. Hewitt, JAGC.

For Appellee: Captain Anthony P. Nicastro, JAGC (argued); Colonel John M. Smith, JAGC (on brief).

Before CUTHBERT, EDWARDS, and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

GONZALES, Judge:

Contrary to his pleas, the appellant was found guilty by a military judge sitting as a general court-martial of rape and forcible sodomy in violation of Articles 120 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 925 (1988) [hereinafter UCMJ]. The convening authority approved the adjudged sentence consisting of a dishonorable discharge, confinement for sixteen years, and reduction to Private E1.[1]

Before this court the appellant asserts, inter alia, that the evidence is factually insufficient to support the findings of guilty. He further contends that the military judge erred on the merits by: (1) excluding evidence of the appellant's good military character; (2) limiting the number of defense witnesses for the character traits of peacefulness and truthfulness; (3) excluding relevant evidence of the appellant's sexual activities with his former wife; and, (4) excluding relevant evidence of the complainant's past sexual behavior. Finally, the appellant contends that he is entitled to a new trial based on newly discovered evidence and fraud on the court. We disagree and affirm.

### I. Factual Sufficiency

Pursuant to our powers under Article 66(c), UCMJ, we find the following facts. At 2030 hours on 3 February 1993, Mrs. F, who was pending a divorce from her soldier-husband, arrived at the Fort Lewis Paradise Club, also known as Club North, for an evening of country dancing. After sitting alone for an hour, she was approached by Private (PV2) Gibson who asked for a dance. They spent the next two and a half hours together talking, dancing, playing pool, and throwing darts. They were joined by PV2 Gibson's friend, PV2 Ward, and perhaps "someone else."[2]

Private Gibson knew the appellant, who was working at the club as the deejay. The appellant had noticed Mrs. F when she first entered the club, but did not meet her until PV2 Gibson later introduced him to PV2 Ward and her. Mrs. F asked the appellant about another deejay who she thought worked at the club and who had worked at her wedding reception. The appellant indicated that, although the other deejay held the contract, he seldom actually worked as a deejay. He also commented to Mrs. F that she wasn't wearing her wedding ring, to which she replied that she had worn a ring when she was married.

When the club closed at 2400 hours, PV2 Gibson, PV2 Ward, and Mrs. F decided to go to the Denny's Restaurant in Lakewood, Washington, for breakfast. Mrs. F invited the appellant to join them. Privates Gibson and Ward rode with Mrs. F and the appellant followed in his van. As they drove through Fort Lewis, Mrs. F was stopped by a military policeman (MP) who informed her that her car's tail lights were not on. After these lights appeared to be operating properly, the four individuals proceeded to Denny's and remained there until approximately 0200 hours on 4 February 1993.

At Denny's, the group sat around a horseshoe shaped table. Mrs. F sat between PV2 Gibson and PV2 Ward. The appellant sat on the other side of PV2 Ward. Most of the conversation centered on military topics, jokes, and the appellant's customized van. At one point Mrs. F asked, "Who likes sex? Who likes oral sex?", jokingly. In the same manner, she also offered to dance on the table if anyone had $50.00 to give her. Dur-

---

1. In his sentencing argument, the trial counsel urged the military judge to adjudge a dishonorable discharge, a lengthy period of confinement, and reduction to Private E1. He did not argue for any forfeitures of pay and allowances. The defense counsel asked the military judge to consider the appellant's financial obligations to his three children, ages 12, 11, and 9, from his previous marriage, when determining any forfei-tures of pay and allowances. There was evidence in the record that the appellant was a good father to his children and was paying $690.00 per month in child support.

2. Mrs. F is the only person who testified that there was "someone else" with PV2 Gibson and PV2 Ward.

ing the next five to ten minutes, everyone but the appellant responded in a similarly joking manner. When the appellant pulled $50.00 out of his pocket, Mrs. F realized that the appellant had taken her suggestions too seriously. She was so uncomfortable with the appellant's actions that she excused herself and went to the rest room.

When she returned, the group decided to leave. Mrs. F drove PV2 Gibson and PV2 Ward to Fort Lewis. The appellant followed behind them because of the tail light problem on Mrs. F's car. Mrs. F dropped PV2 Ward at his barracks and he got into the appellant's van.

Mrs. F drove to PV2 Gibson's barracks and parked in his unit's parking lot. He remained in the car for the next two hours talking to and kissing Mrs. F. There was no sexual intercourse between Mrs. F and him, although the subject was discussed. Both Mrs. F and PV2 Gibson noticed the appellant's van pass by them at least once. At approximately 0500 hours, PV2 Gibson exited the car and Mrs. F started her drive to her parents' home in Renton, Washington.

Meanwhile, the appellant and PV2 Ward had been sitting in the appellant's van discussing the military, PV2 Ward's pending divorce, and the sexual part of the conversation that occurred with Mrs. F at Denny's. The appellant expressed to PV2 Ward his "without a doubt" desire to have sex with Mrs. F. Their curiosity about what might be occurring between PV2 Gibson and Mrs. F caused them to drive by her parked car at least once. Eventually, PV2 Ward returned to his barracks and the appellant drove to his on-post billets and changed into his physical training (PT) uniform. Later, on his way to his unit's PT formation area, the appellant drove out of his way to see if Mrs. F's car was still parked in PV2 Gibson's unit parking lot. As he approached the lot, he saw Mrs. F's car leaving.

Mrs. F noticed the appellant's van in front of her as she was driving away from PV2 Gibson's barracks. She passed the appellant's van, but stopped when he flashed his head lights at her. She thought the appel-

lant was trying to notify her that her car's tail lights were off again. They both stopped and got out of their vehicles. She realized nothing was wrong with her tail lights and that the appellant just wanted to ask her if she wanted "to kill an hour" and "get a drink" with him before he had to report for his unit's PT formation. She agreed, believing that the appellant intended to return to Denny's for coffee or a coke. She got back into her car and followed the appellant's van.

The appellant drove past the main NCO Club, then turned down a dirt road and stopped near a secluded beach area. Mrs. F stopped her car on the passenger side of the appellant's van. The appellant turned on the dome light in his van and motioned for Mrs. F to join him. She turned off her car, but left the keys in the ignition thinking that she would return to her car immediately. However, during the course of the next half hour, the following events occurred in the appellant's van.

Mrs. F opened the passenger door of the van and asked the appellant where they were. He told her that they were on the left side of the main NCO Club. He invited her into his van to take a look at all the features he had described to her earlier in the evening (television, telephone, four captain's chairs, and a bench seat). She got in and initially sat in the front passenger captain's chair.

The appellant began to talk about the conversation at Denny's concerning oral sex. Mrs. F tried to change the subject, then finally told the appellant that she didn't want to talk about it. The heat from the front heater was too hot for her, even though the heater's selector switch was on the lowest possible level. At the appellant's invitation she moved to the rear passenger's captain's chair next to the one in which the appellant was sitting. The appellant began to think that "the possibilit[y] [existed that] we might have sex." When Mrs. F started "wiggling" in her chair, the appellant asked her what was wrong. She told him she had suffered a lower back injury at her job.[3] The appellant offered to rub her back and she permitted

3. Mrs. F had a laparoscopy at Madigan Army Medical Center two years earlier for pelvic pain.

him to do so. When the appellant started to rub Mrs. F's stomach instead, she jerked to let him know that she did not want him to rub her there. The appellant then turned her around so that she was facing him and put her in a kneeling position in between his legs. He grabbed her head and forced it down toward his exposed penis. She was able to break her head free and told the appellant, "Don't!" The appellant grabbed her head again with both hands and forced it down toward his penis. This time the appellant's penis penetrated Mrs. F's mouth for a second as she was saying, "Don't." He released her head and she raised it up, telling the appellant to stop. He grabbed her head again and forced it toward his penis and was successful once more in penetrating Mrs. F's mouth as she was repeatedly saying, "Don't, don't, don't."

The appellant then pushed Mrs. F back onto the floor of the van, causing her head to strike the passenger side door. He got on top of her and started to pull down her jeans. Each time Mrs. F tried to get up, the appellant pushed her down. Eventually, he was able to get her right leg out of her jeans. Initially, Mrs. F was successful in avoiding penetration of her vagina by keeping her legs together. However, the appellant forced her legs apart using his body and hands, and penetrated her vagina with his penis. Mrs. F screamed. She told him, "Don't" and complained that "it was hurting." The appellant withdrew his penis and inserted his fingers into her vagina. She was crying and told him, "Stop it." He ignored her and reinserted his penis into her vagina. At this point she gave up fighting because "it wasn't getting me anywhere." The sexual intercourse ended when the appellant ejaculated.

Mrs. F got up, put on her jeans, and noticed blood on the appellant's PT shirt. The appellant continued his sexual advances by fondling her breasts. To get him to stop, she told him that she needed to go to a rest room. He told her that there wasn't one around, but that she could "go" outside. She then told him that she needed something to drink. Mrs. F got back in her car and initially followed the appellant back up the dirt road. He stopped at a recreational vehi-

cle campsite that he thought had a soda machine and asked Mrs. F what kind of soda she wanted. She said she didn't care. As the appellant walked toward the soda machine, she drove around the appellant's van and left the campsite area.

She drove directly to the MP information booth at the nearest gate, but before she could get out of her car, the appellant drove up behind her. He got out of his van and approached her car. She started looking for her car registration, proof of insurance, and driver's license and explained to the appellant that she needed these documents in order to get a visitor's pass to reenter the post later that evening. The appellant returned to his van and drove away.

When Mrs. F walked into the information booth, one of the on-duty MPs, Specialist (SPC) Grosserhode, noticed that she was crying, shaking, hugging herself, and that her hair was "messed-up." He asked her if anything was wrong. She initially shook her head no, but then told him that she had been raped by the person who had driven away in the van. Specialist Grosserhode notified the MP desk.

Mrs. F was transported to Madigan Army Medical Center (MAMC) by Investigator Donald for a rape protocol examination, commonly known as a rape kit, by Doctor Foos, an experienced gynecologist. This medical examination confirmed blood inside her vagina and on her cervix, but no sperm (due to the fact that the appellant had a vasectomy); blood stains on the upper outer and inner portions of her thighs, buttocks, and calves; several bruises on her inner thighs; welts on her breasts and right side of her neck; a scratch on her right arm; swollen external genitalia; abdominal pain; a blotchy face; and blood pressure above normal.

Upon returning to her parent's home, and for several weeks thereafter, she was distraught and reclusive, and experienced internal pain in her stomach, hip, and arm that required follow-up treatment.

The appellant's defense was that Mrs. F never indicated that she did not want to have sex with him and consented to their sexual acts or, in the alternative, that he was hon-

estly and reasonably mistaken about her lack of consent because of her sexual comments at Denny's and his assumption that she had some type of sex with PV2 Gibson. He fully cooperated with law enforcement investigators by providing his PT shirt and making a statement where he admitted having a sexual encounter with Mrs. F, but that he believed it was entirely consensual.

■ The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt. UCMJ art. 66(c); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987), *pet. denied*, 28 M.J. 78 (C.M.A.1989).

■ We have reviewed the record in the court-martial proceedings and the briefs filed by the appellant and the government. We have taken into account the oral arguments presented by both counsel. We find that the testimony of PV2 Gibson, PV2 Ward, and Mrs. F are fairly consistent with that of the appellant's, except that the appellant testified that the sexual acts were consensual and Mrs. F testified that they were not. We also find that the physical injuries to Mrs. F are inconsistent with the appellant's theory of a consensual sexual encounter. After carefully reviewing the record and finding the facts as stated above, we hold that the evidence is factually sufficient to support the findings of guilty of rape and forcible sodomy.

## II. Evidence of Good Military Character

The appellant asserts that the military judge erred when he excluded evidence of his good military character based solely on lack of relevance. The appellant's first witness was retired First Sergeant Anderson, who first supervised the appellant when the appellant was a sergeant (E5) in 1984. When the assistant trial defense counsel asked Mr. Anderson, "Did you have an opportunity to form an opinion regarding [the appellant's] duty performance?", the trial counsel objected on the basis of relevance. Before the military judge could rule on the objection, the assistant trial defense counsel indicated that he intended to ask Mr. Anderson and

two other witnesses, who had supervised the appellant at various times between 1984 and 1989, about the appellant's character for nonviolence or peacefulness, integrity, and honesty under Military Rule of Evidence 404(a)(1) [hereinafter Mil.R.Evid.]. The military judge then stated, "I don't understand why good military character, duty performance seven years ago, ten years ago ... I don't understand how it's relevant to the issues facing the court ... I'm willing to listen to your argument and to your logic, but tell me why." His ruling, however, was that the defense could call two of the three desired witnesses and that the defense could "elicit testimony for whatever relevance you can establish."

Upon resuming his questioning of Mr. Anderson, the assistant trial defense counsel rephrased his earlier question by asking Mr. Anderson if he had "an opportunity to form an opinion regarding the type of soldier Sergeant First Class Black was and is?" Mr. Anderson answered, "Yes." The assistant trial defense counsel then asked, "And what is your opinion?" The trial counsel objected, again on the basis of relevance. The military judge told the assistant trial defense counsel to rephrase his question. But instead of rephrasing his question on good military character, the assistant trial defense counsel asked Mr. Anderson his opinion regarding the appellant's character for nonviolence or peacefulness and truthfulness. The assistant trial defense counsel also questioned the defense's second witness, Captain (CPT) Brouilette, on only these two character traits.

The trial defense counsel then asked the military judge to clarify whether the defense's third witness, retired Sergeant Major Grosvanor, could also testify on the character traits of peacefulness and truthfulness. The military judge indicated that he would not permit Mr. Grosvanor to testify on these matters because his testimony would be cumulative. However, the military judge quickly added that if Mr. Grosvanor was going to testify about a different character trait, his testimony would be permitted. The defense chose not to call Mr. Grosvanor as a witness on any character trait.

■ An accused is entitled to present evidence of a pertinent trait of character under Mil.R.Evid. 404(a)(1). *United States v. Brown,* 41 M.J. 1, 4 (C.M.A.1994). Good military character is a character trait within the meaning of Mil.R.Evid. 404(a)(1). *United States v. Court,* 24 M.J. 11, 14 (C.M.A. 1987). Evidence of an accused's general good military character is always relevant in the prosecution of sexual offenses. *See United States v. Benedict,* 27 M.J. 253, 262 (C.M.A.1988); *United States v. McNeill,* 17 M.J. 451, 452 (C.M.A.1984).[4] The failure of a military judge to admit otherwise admissible evidence of an accused's good military character solely on the basis of lack of relevance constitutes error. *United States v. Thomas,* 18 M.J. 545, 549 (A.C.M.R.1984). If such an error is found, it will be tested for prejudice by considering the following four-part test: (1) How strong and conclusive is the Government's case against the accused? (2) How strong or plausible is the defense's theory of the case? (3) How material is the excluded evidence to the issue of the appellant's military character at the time of the charged offenses? and (4) What is the quality and quantity of any substitute of good military character evidence in the record of trial? *United States v. Weeks,* 20 M.J. 22, 25 (C.M.A.1985).

■ Although there should have been no question concerning the admissibility of the appellant's good military character evidence in this case, the military judge, for some reason, questioned the relevance of such evidence. Nevertheless, he ruled that the defense could elicit character testimony for whatever relevance the defense could establish. The defense attempted to introduce relevant evidence on the appellant's good military character when he asked Mr.

Anderson's opinion regarding the type of soldier the appellant had been. We find that the military judge erred by not overruling the trial counsel's objection and instructing Mr. Anderson to answer the properly asked question on good military character. Therefore, we hold that the effect of this ruling was to exclude evidence of the appellant's good military character.

■ Applying the *Weeks* four-prong test for prejudice to our findings of fact, we find: (1) that the government's case against the appellant was thorough and convincing, and (2) that the appellant's theory of the case was implausible when considered in light of the totality of the evidence. We also find that (3) the proffered testimony of Mr. Anderson and CPT Brouillette was not material to the issue of the appellant's good military character at the time of the offenses due to the lack of supervision over the appellant for several years. We further find that (4) there was better evidence in the record than the excluded good military character evidence that could have been offered by Mr. Anderson and CPT Brouillette. The appellant had been promoted twice since first working for Mr. Anderson and now stood before the military judge as a sergeant first class (E7) in the military occupational specialty of chemical specialist (54B) with four Army Commendation Medals,[5] three Army Achievement Medals,[6] three awards of the Noncommissioned Officer (NCO) Professional Development Ribbon,[7] and four Good Conduct Medals.[8] Accordingly, we hold that the appellant was not prejudiced by this error.

### III. Limiting the Number of Defense Witnesses

As stated above, the military judge did not permit Mr. Grosvanor to testify about the

---

4. It may not be admissible, though relevant, if there is another valid legal reason to exclude it, such as cumulativeness. Mil.R.Evid. 403.

5. This medal is awarded to any member of the Armed Forces who distinguishes himself by heroism, meritorious achievement or meritorious service.

6. This medal is awarded to any member of the Armed Forces who distinguishes himself by meritorious service or achievement.

7. The ribbon recognizes successful completion of up to four designated NCO professional development courses in the U.S. Army. Three awards would signify that the appellant successfully completed a Primary Leadership Course (PLC), a Basic NCO Course (BNCOC), and an Advanced NCO Course (ANCOC).

8. This medal is awarded to a soldier who distinguishes himself from among his fellow soldiers by his exemplary conduct, efficiency, and fidelity in active Federal military service.

appellant's character for peacefulness and truthfulness because his testimony would have been cumulative with what had already been provided by Mr. Anderson and CPT Brouillette. Nevertheless, the military judge modified his ruling shortly thereafter when the trial defense counsel asked if either the appellant's father or Sergeant (SGT) Doucet could also testify on the appellant's character for peacefulness and truthfulness. The military judge told the trial defense counsel that one of the two could testify on these same matters. The appellant's father testified on these two character traits. Later, when the expected testimony of the appellant's former wife became a matter of contention, as discussed below, the military judge announced that any testimony from her about the appellant's character for peacefulness would also be cumulative.

 While, generally, defense witnesses are to be determined by the accused and his counsel, an accused has no Constitutional right to a witness' testimony which would be cumulative. *United States v. Harmon*, 40 M.J. 107, 108 (C.M.A.1994). Although relevant, evidence may be excluded if its probative value is substantially outweighed by needless presentation of cumulative evidence. Mil.R.Evid. 403. The military judge has discretion in determining when a witness' testimony is cumulative. *Harmon*, 40 M.J. at 108. When reviewing a military judge's decision, the standard of review is abuse of discretion. *Id.* Once the military judge has determined that the testimony of witnesses would be cumulative and he has ruled on the number of witnesses who may testify, only the defense may properly decide which of the witnesses will be called. *United States v. Williams*, 3 M.J. 239, 243 n. 9 (C.M.A.1977).

The defense wanted to call six witnesses to testify on the appellant's character for peacefulness and truthfulness. The military judge permitted the defense to select three of the six witnesses to testify on these two traits. We find that Mr. Grosvanor's, SGT Doucet's, and the appellant's former wife's testimony would not have added anything to the defense's uncontroverted character traits evidence. Accordingly, we hold that the military judge's ruling was not an abuse of his discretion.

## IV. Evidence of Past Sexual Activities with Former Wife

The trial defense counsel attempted to elicit testimony from the appellant's former wife about their sex life. The trial counsel objected on the basis of relevance. The trial defense counsel explained to the military judge that:

> Miss Black [9] is going to testify to the type of intercourse she has had with Sergeant Black, that it is vigorous, rough, and that after that intercourse she has often bled after intercourse, and that by his fingernails and from his vigorous sex that's caused her to bleed and she has been very sore; very similar to the statements that the government witness, [Mrs. F.], has testified to. The defense argues vehemently that this is relevant. This shows and corroborates [the appellant's] version of the facts.

The military judge then ruled that Miss Black's testimony was not admissible, citing Mil.R.Evid. 608(b), specific instances of conduct.

The appellant had testified earlier that the sexual intercourse he had with Mrs. F in his van was rough and similar in style to sexual intercourse he had had before. More important though, his testimony provided his rationale as to why his sexual encounter in this instance had been so rough. As he explained it twice:

> It was kind of really rough. It was kind of fast and mainly that was because I was getting close to PT time. You know I only had so much time basicly between then and when I had to be at PT ...
>
> . . . .
>
> The sex was quick, because I didn't have a lot of time, because I had to go to PT, because of the fact that it was quick and it was in a more or less confined area of the floor in the van and not on the bed or the bench seat that was in the back of the van that, you know, there's no cushion on the

---

**9.** All parties at trial referred to the appellant's former wife as "Miss" Black.

bottom floor of that van basically. It was just rough.

Nowhere in the appellant's explanation as to why his sexual intercourse with Mrs. F had been so quick, vigorous, rough, and painful to her, is the idea that this was the manner or style of sexual intercourse he routinely enjoyed, especially with his former wife. Instead, he stated that his sexual intercourse with Mrs. F had been as described above because of the confined area of his van, the van's uncushioned floor, and the limited amount of time he had before having to report to his unit's PT formation.

 The military judge has the initial responsibility to determine whether evidence is relevant within the meaning of Mil.R.Evid. 401. *United States v. Orsburn*, 31 M.J. 182, 187 (C.M.A.1990). Relevant evidence is evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action probable or less probable than it would be without the evidence. Mil.R.Evid. 401; *United States v. Houser*, 36 M.J. 392, 399 (C.M.A.1993). The standard of review of a military judge's ruling on the basis of relevance is abuse of discretion. *Orsburn*, 31 M.J. at 187.

 Although the military judge relied on Mil.R.Evid. 608(b), the better rule for excluding Miss Black's testimony was simply Mil.R.Evid. 401. We find that her testimony about her sexual activities with the appellant would not have tended to make more or less probable the appellant's version as to why the sexual intercourse had been so quick, rough, and vigorous. Therefore, we hold that the military judge did not abuse his discretion in excluding Miss Black's testimony.

## V. Evidence of the Complainant's Past Sexual Behavior

At a motion in limine hearing, the trial counsel requested that the defense be prohibited from mentioning Mrs. F's sexual comments at Denny's and from eliciting evidence that Mrs. F had performed consensual oral sex on PV2 Gibson while the two were parked in her car outside of his barracks. The appellant responded that this evidence was necessary to show his state of mind with respect to his defense of mistake of fact on Mrs. F's lack of consent. The appellant testified on the motion that he saw Mrs. F's car idling in the parking lot and that the windows were "kind of foggy." He twice stated that it was "hard" or "difficult" to tell what exactly was occurring inside the car.

The military judge ruled that Mrs. F's sexual comments made in front of the appellant were admissible, but that evidence of Mrs. F performing oral sex on PV2 Gibson in her parked car was inadmissible because it was not relevant and that it was more prejudicial than probative. The military judge refused to allow the trial defense counsel to question Mrs. F and PV2 Gibson about the oral sex during their cross-examination. However, the appellant was permitted to testify about his observations of Mrs. F's parked car and his assumption that the "possibility existed that [Mrs. F and PV2 Gibson] were probably having some type of sex."

 In the prosecution for nonconsensual sexual offenses, Mil.R.Evid. 412 specifies in pertinent part that evidence of a victim's past sexual behavior with persons other than the accused is not admissible unless constitutionally required to be admitted. *United States v. Jensen*, 25 M.J. 284, 286 (C.M.A. 1987). The United States Court of Appeals for the Armed Forces [hereinafter the Court of Appeals] adopted the Supreme Court's test in *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), that evidence is constitutionally required to be admitted if it is relevant, material, and favorable to the defense's theory of the case. *United States v. Dorsey*, 16 M.J. 1, 4 (C.M.A.1983). There is, however, no Constitutional right to the testimony of a witness which would not be relevant, and, therefore, it is not a violation of due process to deny an accused such a witness. *United States v. Williams*, 3 M.J. at 242. The standard of review to apply to a military judge's rulings under Mil.R.Evid. 412 is abuse of discretion. *United States v. Hurst*, 29 M.J. 477, 481 (C.M.A.1990).

 It is a defense to an offense that the accused held, as a result of mistake, an

incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense. Rule for Courts–Martial 916(j) [hereinafter R.C.M.]. This defense concerns what an accused knew at the time of the offense, not what he knew after the fact. *United States v. Pierce*, 40 M.J. 601, 605 (A.C.M.R.1994). His state of mind at the time of the offense is relevant. *See United States v. Fox*, 24 M.J. 110, 112 (C.M.A.1987). Knowledge that the accused acquired after the offense is irrelevant. *Doe v. United States*, 666 F.2d 43, 48 (4th Cir. 1981).

■ The appellant had the opportunity to observe that Mrs. F and PV2 Gibson remained inside her parked car. However, by his own admissions, it was difficult for the appellant to observe what, if anything, occurred between Mrs. F and PV2 Gibson inside the car. We, therefore, find that the appellant had no knowledge of Mrs. F's performing oral sex on PV2 Gibson prior to his own sexual encounter with her. We also find that the knowledge the appellant had about the oral sex was not relevant because it was unknown to him at the time he committed the charged offenses. Thus, the irrelevant evidence that the military judge excluded was not constitutionally required to be admitted into evidence under Mil.R.Evid. 412. Accordingly, we hold that the military judge's ruling on the motion in limine was not an abuse of his discretion.

## VI. No Prejudice to the Appellant

■ Having held that the military judge erred with respect to character evidence in part II, above, and assuming, arguendo, that the military judge erred on any of his evidentiary rulings discussed in parts III, IV, and V, above, we hold that no error, or any combination thereof, prejudiced the appellant. We note again, that the evidence of the appellant's guilt is strong and convincing. Not only did the victim testify that the appellant forced her to perform oral and vaginal

sex with him, she made a fresh complaint. Furthermore, there was clear evidence that the appellant was predisposed to having sex with Mrs. F. More important, however, is the testimony from four law enforcement officers and a psychiatric technician, each of whom saw and spoke with Mrs. F immediately after the incident; the detailed rape kit evidence offered by the physician; and the testimony on Mrs. F's demeanor after the incident provided by her mother. The testimony of each of these witnesses corroborates that of the others and is consistent with Mrs. F's version of the facts. Finally, there is no reasonable likelihood that the excluded evidence, either singularly or jointly, would have affected the judgment of the trier of fact. *See United States v. Lucas*, 5 M.J. 167, 172–73 (C.M.A.1978) (excluded testimony); *United States v. Colon–Angueira*, 16 M.J. 20, 27 (C.M.A.1983) (complainant's past sexual behavior); *United States v. Giambra*, 38 M.J. 240, 242 (C.M.A.1993) (erroneous evidentiary rulings).

## VII. Petition for New Trial

The appellant (the petitioner for new trial) contends that he is entitled to a new trial on the grounds of newly discovered evidence and fraud on the court which tried his case.[10] The petition is based, in part, on a Criminal Investigation Command (CID) investigation completed two months after the appellant's court-martial, a copy of which is part of the allied papers. This investigation was initiated after the CID received a complaint from the appellant's brother that PV2 Gibson and PV2 Ward were prejudiced against blacks and had conspired to commit perjury when they testified at the appellant's court-martial.[11] In support of his petition, the appellant submitted affidavits from eight individuals who did not testify at trial, but who either knew or had contact after the trial with at least one of the following witnesses: Mrs. F, PV2 Gibson, PV2 Ward, and SPC Grosserhode.

10. These matters were first raised in the appellant's request for a post-trial Article 39(a), UCMJ, session, which the convening authority denied on 21 January 1994.

11. The appellant is black. Privates Gibson and Ward and Mrs. F are white.

A new trial based on newly discovered evidence will not be granted unless the new evidence: (1) was discovered after trial; (2) would not have been discovered at the time of trial in the exercise of due diligence; and, (3) if considered at trial, would probably have produced a substantially more favorable result for the appellant. *United States v. Suarez*, 35 M.J. 374, 377 (C.M.A. 1992); R.C.M. 1210(f)(2)(A)–(C). No fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on the finding of guilty or the sentence adjudged. *United States v. Scaff*, 29 M.J. 60, 65–66 n. 3 (C.M.A.1989); R.C.M. 1210(f)(3).

Even if the appellant has satisfied the first two parts of the three-part test, we will limit our discussion to whether the newly discovered evidence on two possible preexisting friendships between PV2 Gibson and Mrs. F, and between PV2 Gibson and SPC Grosserhode would probably have produced a substantially more favorable result for the appellant. The appellant contends that: (1) there was an on-going relationship between Mrs. F and PV2 Gibson at the time of the incident, (2) SPC Grosserhode was the "someone else" at the club Mrs. F mentioned in her testimony, (3) Mrs. F wanted to protect her relationship with PV2 Gibson, and consequently, (4) when SPC Grosserhode saw her with the appellant outside of the information booth, she had no choice but to report to SPC Grosserhode that she had been raped by the appellant. If the above is true, it could undermine Mrs. F's credibility. *See Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam) (victim told her boyfriend she had been raped by a third party in order to protect her extramarital relationship with the boyfriend).

Focusing first on the relationship between Mrs. F and PV2 Gibson, PV2 Gibson testified that he met Mrs. F at the club on the evening of the offenses. This testimony is now disputed by the hearsay affidavits of Ms. Harris, Ms. Bennett, CPT Engle, and Mr. Zimmermann. Ms. Harris, a former military policewoman who arrived in PV2 Gibson's company two months after the offenses, states that, "Gibson told me that he knew the alleged victim before the night of the incident and that he and she had dated before the night of the incident." Ms. Bennett, a former girlfriend of PV2 Ward, states that PV2 Gibson told her something to the effect that, "[H]e and his former girlfriend had been going together about two weeks prior to the rape, and then broke off their relationship about a week after the rape." Captain Engle, the appellant's assistant trial defense counsel, stated that Ms. Klarnet, another girlfriend of PV2 Ward, told him that PV2 Ward told her that, "Gibson and [Mrs. F] had a relationship as boyfriend/girlfriend but [PV2 Ward] did not say when this relationship existed." Captain Engle also stated in his affidavit that PV2 Ward told him that, "he and Gibson were going to the Club North to meet a woman Gibson had met at the club a couple of nights earlier but [PV2 Ward] would not say if [Mrs. F] was that person." [12] The substance of Mr. Zimmermann's affidavit will be discussed below when we review whether there was a fraud on the court.

The CID investigation report indicates that PV2 Gibson was interviewed about his relationship with Mrs. F and he reiterated that he first met her "the evening of the rape and had not known her before that night." He also stated that he may have subsequently told Ms. Bennett he had been dating Mrs. F prior to the rape. However, he indicated that they were at the club and that he was intoxicated. If he did tell her this, it was not true. There is nothing in the report to suggest that his answer did not apply to Ms. Harris' statement also. Private Gibson's CID statement is consistent with his testimony at trial as to when he met Mrs. F.

Turning our attention to whether SPC Grosserhode and PV2 Gibson were friends, the appellant asserts that SPC Grosserhode was the "someone else" Mrs. F mentioned in her testimony that was with PV2 Gibson and PV2 Ward when she joined them at the club. Thus, when she realized that SPC Grosserhode saw her with the appellant outside of

---

12. Mrs. F testified that she originally had plans to spend the evening with a girlfriend in Renton, Washington. When her friend couldn't go out because of illness, Mrs. F decided to drive to Fort Lewis on her own.

his information booth early the next morning, she was motivated to lie as to why she was with the appellant in order to prevent SPC Grosserhode from telling PV2 Gibson what he had seen.[13] However, Mrs. F also testified that she did not recall who the "someone else" was. We also note that the appellant never testified that PV2 Gibson introduced him to "someone else" when PV2 Gibson introduced him to PV2 Ward and Mrs. F at the club. Nor is there any evidence that Mrs. F knew that PV2 Gibson and SPC Grosserhode were friends at that time she reported the rape. Additionally, the great weight of the information in the affidavits indicate that whatever friendship existed between PV2 Gibson and SPC Grosserhode, it began months after the date of the offenses.

Private Ward was a defense witness at trial and was one of the principal persons cooperating with the appellant's brother when he complained to the CID that Mrs. F and PV2 Gibson had lied about their relationship at trial. We note that PV2 Ward has never recanted any of his testimony, particularly the most damaging part where he indicated that the appellant was predisposed to having sexual intercourse with Mrs. F, an inclination the appellant later admitted himself on cross-examination. Private Ward also is the only person besides Mrs. F and PV2 Gibson who could shed light on the identity of the "someone else" at the club, but he never indicated at trial or afterwards that there was "someone else" with them or that the "someone else" was SPC Grosserhode.

The alleged fraud on the court is that both Mrs. F and PV2 Gibson lied about the "first" time they met. The appellant believes that Mrs. F and PV2 Gibson met each other weeks before the night of the offenses, and that the affidavits by Ms. Harris, Ms. Bennett, CPT Engle, and Mr. Zimmermann support this position. While their testimony may have given the impression that they met each other for the "first" time at the club, neither Mrs. F nor PV2 Gibson specifically testified on the merits that their club meet-

ing was in fact the "first" time. The only testimony that is clear on the timing of their "first" meeting is when PV2 Gibson testified during the hearing on the motion in limine. In response to a question posed by the military judge, PV2 Gibson confirmed that he "first" met Mrs. F at the club. Private Gibson never repeated this answer on the merits because no one asked him the question. Mrs. F never stated, on the motion or on the merits, when she "first" met PV2 Gibson. On how they got together at the club, she simply answered, "I was about to leave when Private Gibson came up and asked me to dance."

The subsequent newspaper article that Mr. Zimmermann, the appellant's appellate defense counsel, references in his affidavit, indicating that Mrs. F admitted that she was with a "former date" on the evening of the offenses, is not proof that she committed a fraud on the court. As we stated above, she never testified on when she "first" met PV2 Gibson or that there had not been a previous or ongoing relationship with him. The nature of her testimony is different from that of the rape victim's in *Olden* where the victim clearly testified that she was living with her mother at the time of the offenses. There, the judge refused to allow the defense to impeach her testimony on cross-examination by showing that the victim was instead living with her boyfriend. The United States Supreme Court held that the defense had been improperly denied the opportunity to impeach the victim's testimony on cross-examination. *Olden*, 488 U.S. at 232–33, 109 S.Ct. at 483–84.

Nor is the instant case similar to the circumstances in *United States v. Williams*, 37 M.J. 352 (C.M.A.1993). There, the married rape victim specifically testified at an Article 32(b), UCMJ, hearing that a third person was just an associate, when in reality he was her steady boyfriend. Also, it was only after the accused informed others about his consensual sexual intercourse with the victim

---

13. We will not discuss whether PV2 Gibson, PV2 Ward, and SPC Grosserhode were prejudiced against blacks. Assuming, arguendo, that they were, in order for it to have been a factor in what motivated Mrs. F to lie to SPC Grosserhode, she would have had to have known about the prejudice and appreciated its consequences. There is no evidence that Mrs. F was aware that this attitude existed in any of the minds of these three individuals.

that she alleged rape. In reversing the conviction, the Court of Appeals held that a newly convened court-martial might reasonably find or infer that the rape victim was so concerned about preserving her extramarital relationship with her boyfriend that she would fabricate a rape charge in response to appellant's spreading the word of his having had sexual intercourse with her. *Id.* at 360–61.

Assuming, arguendo, that there was a relationship between Mrs. F and PV2 Gibson prior to the offenses, it would not have resulted in different findings by the trier of fact. Mrs. F made an immediate complaint that she had been raped. At that time she had no reason to believe that PV2 Gibson knew or would later know that she had been alone with the appellant, unlike the boyfriend in *Olden*, who saw his girlfriend getting out of the defendant's car. Also, unlike the situation in *Williams*, there had been no time for the appellant to brag about the sexual encounter with Mrs. F to PV2 Gibson before she made her complaint. Nor is there any evidence that the appellant told or led Mrs. F to believe that he was going to report what occurred between them to PV2 Gibson.

 Requests for a new trial on the ground of newly discovered evidence are not regarded with favor and should be granted only with great caution. *United States v. Bacon*, 12 M.J. 489, 492 (C.M.A.1982). Relief is granted only if a manifest injustice would result absent a new trial based on the proffered newly discovered evidence. *Williams*, 37 M.J. at 356. Likewise, a request for a new trial based on fraud on the court should not be granted unless we are reasonably well satisfied that the testimony given at trial by a material witness was false. *United States v. Giambra*, 33 M.J. 331, 335 (C.M.A.1991). The burden of proof is on the appellant to prove by the greater weight of the evidence

that the witnesses lied at his trial. *Id.* at 336. In exercising our discretion on a petition for new trial, we have the prerogative of weighing the testimony at trial against the post-trial evidence to determine which is credible. *Bacon*, 12 M.J. at 492.

The appellant has failed to meet his burden by presenting credible evidence that Mrs. F and PV2 Gibson lied about the "first" time they met each other. He also has failed to demonstrate that SPC Grosserhode and PV2 Gibson were friends prior to the date of the offenses. More important, he has submitted no evidence that SPC Grosserhode was the "someone else" at the club with PV2 Gibson, PV2 Ward, and Mrs. F. The appellant's request is based on an abundant amount of hearsay and far-reaching speculation, none of which "would probably produce a substantially more favorable result for the accused." Accordingly, using the standard of review for petitions for new trial, we hold that the appellant has not demonstrated that he is entitled to relief. UCMJ art. 73; R.C.M. 1210(f).

## VIII. Decision

We also have considered the remaining assignments of error and find them without merit.

The findings of guilty and the sentence are affirmed.

The Petition for New Trial is denied.

Chief Judge CUTHBERT and Senior Judge EDWARDS concur.