# OLDEN *v.* KENTUCKY

No. 88–5223.   Decided December 12, 1988

PER CURIAM.

Petitioner James Olden and his friend Charlie Ray Harris, both of whom are black, were indicted for kidnaping, rape, and forcible sodomy. The victim of the alleged crimes, Starla Matthews, a young white woman, gave the following account at trial: She and a friend, Regina Patton, had driven to Princeton, Kentucky, to exchange Christmas gifts with Bill Russell, petitioner's half brother. After meeting Russell at a local car wash and exchanging presents with him, Matthews and Patton stopped in J. R.'s, a "boot-legging joint" serving a predominantly black clientele, to use the restroom. Matthews consumed several glasses of beer. As the bar became more crowded, she became increasingly nervous because she and Patton were the only white people there. When Patton refused to leave, Matthews sat at a separate table, hoping to demonstrate to her friend that she was upset. As time passed, however, Matthews lost track of Patton and became somewhat intoxicated. When petitioner told her that Patton had departed and had been in a car accident, she left the bar with petitioner and Harris to find out what had happened. She was driven in Harris' car to another location, where, threatening her with a knife, petitioner raped and sodomized her. Harris assisted by holding her arms. Later, she was driven to a dump, where two other men joined the group. There, petitioner raped her once again. At her request, the men then dropped her off in the vicinity of Bill Russell's house.

On cross-examination, petitioner's counsel focused on a number of inconsistencies in Matthews' various accounts of the alleged crime. Matthews originally told the police that she had been raped by four men. Later, she claimed that she had been raped by only petitioner and Harris. At trial, she contended that petitioner was the sole rapist. Further, while Matthews testified at trial that petitioner had threatened her with a knife, she had not previously alleged that petitioner had been armed.

Russell, who also appeared as a State's witness, testified that on the evening in question he heard a noise outside his home and, when he went out to investigate, saw Matthews get out of Harris' car. Matthews immediately told Russell that she had just been raped by petitioner and Harris.

Petitioner and Harris asserted a defense of consent. According to their testimony, Matthews propositioned petitioner as he was about to leave the bar, and the two engaged in sexual acts behind the tavern. Afterwards, on Matthews' suggestion, Matthews, petitioner, and Harris left in Harris' car in search of cocaine. When they discovered that the seller was not at home, Matthews asked Harris to drive to a local dump so that she and petitioner could have sex once again. Harris complied. Later that evening, they picked up two other men, Richard Hickey and Chris Taylor, and drove to an establishment called The Alley. Harris, Taylor, and Hickey went in, leaving petitioner and Matthews in the car. When Hickey and Harris returned, the men gave Hickey a ride to a store and then dropped Matthews off, at her request, in the vicinity of Bill Russell's home.

Taylor and Hickey testified for the defense and corroborated the defendants' account of the evening. While both acknowledged that they joined the group later than the time when the alleged rape occurred, both testified that Matthews did not appear upset. Hickey further testified that Matthews had approached him earlier in the evening at J.R.'s and told him that she was looking for a black man with whom to have sex. An independent witness also appeared for the defense and testified that he had seen Matthews, Harris, and petitioner at a store called Big O's on the evening in question, that a policeman was in the store at the time, and that Matthews, who appeared alert, made no attempt to signal for assistance.

Although Matthews and Russell were both married to and living with other people at the time of the incident, they were apparently involved in an extramarital relationship. By the

time of trial the two were living together, having separated from their respective spouses. Petitioner's theory of the case was that Matthews concocted the rape story to protect her relationship with Russell, who would have grown suspicious upon seeing her disembark from Harris' car. In order to demonstrate Matthews' motive to lie, it was crucial, petitioner contended, that he be allowed to introduce evidence of Matthews' and Russell's current cohabitation. Over petitioner's vehement objections, the trial court nonetheless granted the prosecutor's motion *in limine* to keep all evidence of Matthews' and Russell's living arrangement from the jury. Moreover, when the defense attempted to cross-examine Matthews about her living arrangements, after she had claimed during direct examination that she was living with her mother, the trial court sustained the prosecutor's objection.

Based on the evidence admitted at trial, the jury acquitted Harris of being either a principal or an accomplice to any of the charged offenses. Petitioner was likewise acquitted of kidnaping and rape. However, in a somewhat puzzling turn of events, the jury convicted petitioner alone of forcible sodomy. He was sentenced to 10 years' imprisonment.

Petitioner appealed, asserting, *inter alia*, that the trial court's refusal to allow him to impeach Matthews' testimony by introducing evidence supporting a motive to lie deprived him of his Sixth Amendment right to confront witnesses against him. The Kentucky Court of Appeals upheld the conviction. No. 86–CR–006 (May 11, 1988). The court specifically held that evidence that Matthews and Russell were living together at the time of trial was not barred by the State's rape shield law. Ky. Rev. Stat. Ann. § 510.145 (Michie 1985). Moreover, it acknowledged that the evidence in question was relevant to petitioner's theory of the case. But it held, nonetheless, that the evidence was properly excluded as "its probative value [was] outweighed by its possibility for prejudice." App. to Pet. for Cert. A6. By way

of explanation, the court stated: "[T]here were the undisputed facts of race; Matthews was white and Russell was black. For the trial court to have admitted into evidence testimony that Matthews and Russell were living together at the time of the trial may have created extreme prejudice against Matthews." Judge Clayton, who dissented but did not address the evidentiary issue, would have reversed petitioner's conviction both because he believed the jury's verdicts were "manifestly inconsistent," and because he found Matthews' testimony too incredible to provide evidence sufficient to uphold the verdict. *Id.*, at A7.

The Kentucky Court of Appeals failed to accord proper weight to petitioner's Sixth Amendment right "to be confronted with the witnesses against him." That right, incorporated in the Fourteenth Amendment and therefore available in state proceedings, *Pointer* v. *Texas*, 380 U. S. 400 (1965), includes the right to conduct reasonable cross-examination. *Davis* v. *Alaska*, 415 U. S. 308, 315–316 (1974).

In *Davis* v. *Alaska*, we observed that, subject to "the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation . . . , the cross-examiner has traditionally been allowed to impeach, *i. e.*, discredit, the witness." *Id.*, at 316. We emphasized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.*, at 316–317, citing *Greene* v. *McElroy*, 360 U. S. 474, 496 (1959). Recently, in *Delaware* v. *Van Arsdall*, 475 U. S. 673 (1986), we reaffirmed *Davis*, and held that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" 475 U. S., at 680, quoting *Davis*, *supra*, at 318.

In the instant case, petitioner has consistently asserted that he and Matthews engaged in consensual sexual acts and that Matthews—out of fear of jeopardizing her relationship with Russell—lied when she told Russell she had been raped and has continued to lie since. It is plain to us that "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination." *Delaware* v. *Van Arsdall, supra,* at 680.

The Kentucky Court of Appeals did not dispute, and indeed acknowledged, the relevance of the impeachment evidence. Nonetheless, without acknowledging the significance of, or even adverting to, petitioner's constitutional right to confrontation, the court held that petitioner's right to effective cross-examination was outweighed by the danger that revealing Matthews' interracial relationship would prejudice the jury against her. While a trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant," *Delaware* v. *Van Arsdall, supra,* at 679, the limitation here was beyond reason. Speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of Matthews' testimony.

In *Delaware* v. *Van Arsdall, supra,* we held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* [v. *California,* 386 U. S. 18 (1967)] harmless-error analysis." *Id.,* at 684. Thus we stated:

> "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.

Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Ibid.*

Here, Matthews' testimony was central, indeed crucial, to the prosecution's case. Her story, which was directly contradicted by that of petitioner and Harris, was corroborated only by the largely derivative testimony of Russell, whose impartiality would also have been somewhat impugned by revelation of his relationship with Matthews. Finally, as demonstrated graphically by the jury's verdicts, which cannot be squared with the State's theory of the alleged crime, and by Judge Clayton's dissenting opinion below, the State's case against petitioner was far from overwhelming. In sum, considering the relevant *Van Arsdall* factors within the context of this case, we find it impossible to conclude "beyond a reasonable doubt" that the restriction on petitioner's right to confrontation was harmless.

The motion for leave to proceed *in forma pauperis* and the petition for certiorari are granted, the judgment of the Kentucky Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, dissenting.

I continue to believe that summary dispositions deprive litigants of a fair opportunity to be heard on the merits and create a significant risk that the Court is rendering an erroneous or ill-advised decision that may confuse the lower courts. See *Pennsylvania* v. *Bruder, ante.* p. 11 (MAR-

SHALL, J., dissenting); *Rhodes* v. *Stewart, ante,* p. 4 (MAR-SHALL, J., dissenting); *Buchanan* v. *Stanships, Inc.,* 485 U. S. 265, 269 (1988) (MARSHALL, J., dissenting); *Commissioner* v. *McCoy,* 484 U. S. 3, 7 (1987) (MARSHALL, J., dissenting). I therefore dissent from the Court's decision today to reverse summarily the decision below.