UNITED STATES, Appellee,

v.

Captain Kenneth L. HARRIS, 427–04–3332, United States Army, Appellant.

ACMR 9100619.

U.S. Army Court of Military Review.

21 May 1992.

Reconsideration Denied June 18, 1992.

For Appellant: Captain Emmett G. Wells, JAGC (argued), Captain James M. Heaton, JAGC (on brief).

For Appellee: Captain Glenn L. Kirschner, JAGC (argued), Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Captain Timothy W. Lucas, JAGC (on brief).

Before NAUGHTON, HOWELL, and JOHNSTON, Appellate Military Judges.

OPINION OF THE COURT

HOWELL, Judge:

Contrary to his pleas, the appellant was found guilty by a general court-martial composed of officer members of extortion, communicating a threat, and indecent assault (three specifications), in violation of Articles 127 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 927, 934 [hereinafter UCMJ]. The court-martial sentenced the appellant to a dismissal, confinement for nine years and six months, and forfeiture of all pay and allowances. The convening authority approved the sentence but suspended any confinement in excess of six years for a period of three years.

Before this Court, the appellant assigns four errors through counsel and personally asserts additional matters for consideration pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982). We will address only the contention that the trial counsel conducted a racially inflammatory cross-examination of a key defense witness. We conclude that the military judge committed reversible error by permitting that cross-examination.

At trial, the government contended that the appellant, who was the unit commander of a company-sized casual detachment located at Fort Dix, New Jersey, extorted sexual favors from and indecently assaulted two female soldiers, Private E2 (PV2) M and PV2 C, who were assigned to the detachment temporarily. During the government's case-in-chief, the two victims, both of whom were white, testified that the appellant, a black officer, called each of them into his office individually, threatened them with nonjudicial punishment (Article 15, UCMJ) for various minor infractions, and then offered to drop the action in exchange for sexual favors. Each victim testified that during the office session the appellant handed a handwritten note to the soldier offering to drop the Article 15 action if the soldier would agree to have sex with him. According to their testimony, the appellant insisted that each soldier agree to his offer before leaving the office, and then before they left he fondled each victim's breasts and/or vaginal area. To corroborate the victims' testimony, the government presented expert testimony that a notepad seized from the appellant's office contained writing indentations of a note which stated: "Are you willing to make love to me and let me drop everything and keep it between you and me?" Without defense objection, the government presented the appellant's pretrial statement in which he admitted meeting PV2 M and PV2 C alone in his office on separate occasions during his investigation of their reported misconduct. In that statement the appellant denied passing a note to either PV2 M or PV2 C indicating that he wanted sexual favors, and he further denied sexually assaulting either soldier.

To counter the government's theory, the defense tried to show that the appellant was actually the object of a vicious scheme concocted by his alleged female victims to avoid Article 15 punishment. According to the defense theory, PV2 M and PV2 C invented the stories concerning the appellant's sexual misconduct toward them, surreptitiously "planted" the notepad in the appellant's office, and then reported their false allegations of sexual impropriety to the military police. In support of its theory, the defense concentrated on challenging the credibility of PV2 M and PV2 C and demonstrating that the two female soldiers had easy access to the appellant's office to carry out their plan. The appellant did not testify on the merits.

During the defense case-in-chief, several witnesses, including Mr. Brown, a black witness, testified concerning their poor opinion of the truthfulness of PV2 M and PV2 C. Mr. Brown, the key defense witness as to PV2 M on this point, testified on direct examination that during a series of conversations with PV2 M in the United Services Organization (USO) facility at Philadelphia International Airport and the Noncommissioned Officer (NCO) Club on Fort Dix, PV2 M inferred that she had framed the appellant with a false complaint of sexual molestation and a note. According to Mr. Brown, he and the appellant were not acquainted at the time of these conversations. PV2 M's disclosures disturbed him and he later reported them first to a black defense counsel at Fort Dix and ultimately to the appellant's military defense counsel. On cross-examination the trial counsel launched into a dogged effort to show that Mr. Brown was racially biased. Over defense objection, the military judge permitted the trial counsel to question Mr. Brown concerning his efforts to establish a chapter of the National Association for the Advancement of Colored People (NAACP) in the Fort Dix area, and his interest on behalf of the NAACP in drunk driving cases involving Fort Dix soldiers, particularly drill sergeants. After establishing Mr. Brown's involvement with the NAACP, the trial counsel turned the court's attention to an unrelated drunk driving incident involving a Sergeant Smith, inferring that Mr. Brown was interested in the case only because Sergeant Smith was black. Mr. Brown responded that when he first became involved in the case, he did not know Sergeant Smith was black. After several more questions about the NAACP and Mr. Brown's knowledge of the number of black drill sergeants at Fort Dix, the defense counsel again objected on

grounds of lack of relevance. The military judge directed the trial counsel to get to the point and the following colloquy with Mr. Brown ensued.

[Questions by the trial counsel].

Q. Mr. Brown, isn't it just true that you [are] just an activist with a very strong belief in the NAACP?

A. No.

Q. Isn't the only reason you're here or even here for any reason is that Captain Harris is black?

A. No, I didn't even know he was black.

. . . .

Q. [Y]ou stated you contacted Captain L over at the defense office [concerning PV2 M's disclosures], correct?

A. Okay, let me—you want—

Q. Yes or no, sir, did you contact—

A. I'm not going to answer that unless you let me explain it.

. . . .

DC: I once again renew my objection on relevance, Your Honor.

MJ: [At a side-bar conference]. Explain to me, Captain P.

ATC: Well, sir—

DC: Is it a crime to be in the NAACP?

MJ: It's not plainly obvious. You can argue it, but it is not plainly obvious to me. What's plainly obvious is that you're just—

DC: —badgering the witness.

MJ: [Addressing trial counsel]. Get to your point. If you've got a point to make that's relevant to this case—

ATC: I will, Your Honor.

MJ: Probably a fair characterization, you're just up there badgering and brow beating the witness. I'm going to cut you off and sit you down right quick.

ATC: Yes, Your Honor.

ATC: [Continuing with cross-examination]. Mr. Brown, is it your testimony that [PV2 M] came to you and just began to tell you about this incident, correct?

A. No. She came to me and she began to talk, just a friendly talk, and she asked me for a cup of coffee and I gave her a cup of coffee and we had a friendly conversation. It led into a period of time that she told me this incident. It wasn't right away instantly.

Q. So do people normally, over a period of time, allegedly confess crimes to you, sir?

A. Do they, no. Normally, no.

Q. All right. And, sir, you contacted the defense office in regards to this correct?

A. No, I did not.

DC: Objection, Your Honor, I thought we solved this problem.

. . . .

MJ: Overruled. . . .

ATC: [Addressing military judge]. I'm just trying to establish his motive, sir.

. . . .

MJ: [Addressing trial counsel]. You don't have to argue with me. You can argue with the witness. I'm sick and tired of you arguing with the witness, but you don't have to argue with me.

ATC: All right, sir.

. . . .

MJ: [Addressing the witness]. The question is, "How did you come to get to the defense counsel's office?"

A. [Mr. Brown]. Okay, we had a meeting with Captain L [of the Trial Defense Service office] set up back in December [to discuss perceived problems at Fort Dix] . . . I asked him, . . . "Who is Captain Harris?" and he said why. I said, "Well, a Private was telling me she fabricated some information against Captain Harris," and right away he told me, he said, "Well, you know, you need to come in tomorrow morning and talk to Major K [the appellant's military defense counsel] about it," . . .

Q. Okay. And Captain L is black, correct.

A. Yes.

. . . .

Q. And you contacted him first, you did not contact Major K or Captain G?

A. Well, he suggested I contact—he didn't talk to me about the case, he suggested I talk to Major K.

. . . .

## REDIRECT EXAMINATION

(Questions by the defense:)

Q. Mr. Brown, is it a crime to be interested in being a member of the NAACP?

A. No, it's not.

Q. Any crime to be black?

A. No, it's not.

. . . .

## RECROSS EXAMINATION

(Questions by the prosecution:)

Q. Mr. Brown, is it a crime to lie in a court-martial?

A. Can I answer that with an explanation?

Q. No, sir, yes or no.

A. I'm not going to answer yes or no.

MJ: Very well, the question begs the answer. . . .

■ The government argues that the trial counsel conducted legitimate cross-examination under Manual for Courts–Martial, United States, 1984, Mil.R.Evid. 608(c) [hereinafter Mil.R.Evid. 608(c)] into possible racial bias on the part of Mr. Brown. Conversely, the defense contends that the trial counsel's examination, conducted before an all-white panel, was racially inflammatory and prejudiced the appellant's right to a fair hearing. We have concluded that under Mil.R.Evid. 403 the military judge should not have permitted the trial counsel to continue this line of questioning. The judge's failure to properly control the scope of cross-examination was an abuse of discretion and resulted in a substantial likelihood that the court members would make their critical decision concerning Mr. Brown's credibility on an improper basis.

At trial the prosecutor based his cross-examination of Mr. Brown on his assertion that he would show bias and/or a motive to lie on the part of the witness. The gist of the trial counsel's cross-examination was that Mr. Brown was racially biased in favor of the appellant simply because they were both members of the same race, and that Mr. Brown therefore was testifying untruthfully concerning the admissions purportedly made to him by PV2 M in order to aid a fellow black man and further Mr. Brown's goal of establishing a local NAACP chapter.

■ Under our Military Rules of Evidence, proof of bias, prejudice, or motive to lie is always relevant to impeach a witness. *United States v. Burns*, 25 M.J. 817, 819 (A.F.C.M.R.1988); *petition denied*, 27 M.J. 1 (C.M.A.1988), *see also, Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Mil.R.Evid. 608(c). This approach is entirely consistent with that taken by the federal courts toward such evidence. In several decisions interpreting Federal Rule of Evidence 608, on which Mil.R.Evid. 608 is based, the United States Supreme Court has favored a broad scope of cross-examination to show bias. *Davis*, 415 U.S. 308, 94 S.Ct. 1105; *United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988).

■ Nevertheless, such proof is also always subject to the limitations of Mil.R.Evid. 403. Under Mil.R.Evid. 403, the trial court must balance the relevance of evidence against the substantial risk of prejudice to the accused. In pertinent part Mil.R.Evid. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Admissions of evidence requiring the application of the Mil.R.Evid. 403 balancing test generally are within the sound discretion of the trial court. *Burns*, 25 M.J. at 819; Mil.R.Evid. 611(b). Ordinarily we will not disturb such rulings absent an abuse of discretion. However, pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c), this Court will use its judgment to determine, on the basis of the entire record, which findings and sentence should be approved. *United States v. Cole*, 31 M.J. 270 (C.M.A.1990). If that mandate requires us to reverse a case because of an erroneous discretionary ruling by the trial judge, then we will not hesitate to do so. *Cole*, 31 M.J. at 272.

Turning to this case, we find that under Mil.R.Evid. 403 the unfair prejudice to the appellant that was implicit in the trial coun-

sel's cross-examination of Mr. Brown far outweighed any proof of bias, prejudice, or motive to lie that the trial counsel elicited. First, the evidence developed by the trial counsel's line of questioning had little, if any, real probative value. Instead of a probing examination of Mr. Brown's direct testimony to elicit additional information about his motive to fabricate or exaggerate his conversations with PV2 M, what the court received from the trial counsel, over strenuous defense objection, was an emotional suggestion or appeal to disbelieve Mr. Brown because he was a purported NAACP activist bent on helping a fellow black even if that meant committing perjury.

Secondly, in our judgment, the inherently prejudicial nature of this line of questioning created a substantial risk that whatever biased or inaccurate preconceived notions the panel members might harbor about blacks would infect the court's deliberative process. Such a risk was especially acute in this racially sensitive black-on-white sexual assault case tried before an all-white panel. Moreover, the government's evidence, though convincing, was not overwhelming, and Mr. Brown was the principal defense witness concerning a pivotal issue, the credibility of PV2 M.

The authors of Federal Rule of Evidence 403 cautioned against evidence that induces a "decision on a purely emotional basis...." and which creates an "undue tendency to suggest a decision on an improper basis." Fed. Rules of Evid. Rule 403, 28 U.S.C.A., Notes of Advisory Committee on Proposed Rules, 151–152 (West 1984); *United States v. Rodriguez Cortes*, 949 F.2d 532, 541 (1st Cir.1991). Similarly, even though proper inquiry into possible racial bias is permissible under our rules, cross-examination that simply appeals to a member's racial or ethnic bias and has little or no probative value may impermissibly sway the panel's verdict. Consequently, cross-examination that improperly plays on such potential bias has no place in a criminal trial.

We thus conclude that the trial judge's failure to properly apply the limitations of Mil.R.Evid. 403 and thereby control the scope of cross-examination of Mr. Brown constituted reversible error. In our judgment, the trial counsel's cross-examination created a substantial likelihood of undue prejudice that materially undermined the appellant's right to a fair and impartial hearing. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

Because of our resolution of this issue, we need not address the appellant's other assignments of error or his *Grostefon* assertions.

The findings of guilty and the sentence are set aside. A rehearing may be ordered by the same or a different convening authority.

Senior Judge NAUGHTON and Judge JOHNSTON concur.