# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## Washington, DC

## UNITED STATES

### v.

## Darrell R. STIREWALT
## Health Service Technician Second Class, U.S. Coast Guard

### CGCMG 0131
### Docket No. 1089

### 16 May 2000

General Court-Martial convened by Commander, Eighth Coast Guard District. Tried at New Orleans, Louisiana, on 9-14, 16-17 June 1997.

Military Judge: CAPT Lane I. McClelland, USCG
Trial Counsel: CDR Aubrey W. Bogle, USCG
Assistant Trial Counsel LCDR Thomas P. Marian, USCG
Civilian Defense Counsel Earl F. Overby, Esquire
Civilian Defense Counsel Ferdinand L. Salomon, Esquire
Detailed Defense Counsel: CAPT Stephen P. Santiago, USMC
Appellate Defense Counsel: LT Sandra K. Selman, USCGR
Appellate Government Counsel LT Benes Z. Aldana, USCGR

### BEFORE
### PANEL FOUR

### BAUM, KANTOR AND WESTON

Appellate Military Judges

WESTON, Judge:

Appellant was tried by a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was convicted of the following offenses: four specifications of maltreatment by sexual harassment, one specification of rape, one specification of forcible sodomy, three specifications of assault consummated by a battery, four specifications of adultery, and four specifications of indecent assault, in violation of Articles 93, 120, 125, 128, and 134 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§893, 920, 925, 928, and 934, respectively. Prior to sentencing, the military judge dismissed two specifications of maltreatment, two specifications of assault consummated by a battery, and one specification of adultery. The members sentenced appellant to reduction to pay grade E-1, forfeiture of all pay and allowances, confinement for ten years, and a dishonorable discharge. The convening authority approved the sentence as adjudged. Appellate Defense Counsel has assigned fourteen errors on behalf of Appellant, four of which have been orally argued before our Court. Counsel has also filed Trial Defense Counsel s Article 38(c), UCMJ, brief and has brought to the attention of the Court, for consideration pursuant to *U.S. v. Grostefon*, 12 M.J. 431 (CMA 1982), ten additional assignments along with an affidavit from Appellant and two *pro se* supplemental briefs. We will discuss three of the assigned errors that in our view deserve closer analysis. The remaining assignments we have carefully considered, but we find that they lack merit or have been rendered moot by our action on the first assignment of error, and thus they are not mentioned further.

The three claims of error that we believe merit discussion are: 1) The military judge s ruling that a former officer who had engaged in a consensual sexual relationship with an enlisted person was a victim within the meaning of Military Rule of Evidence (M.R.E.) 412 was error, and thus deprived Appellant of the opportunity to present evidence of LTJG B. s motive to falsely deny consenting to sexual intercourse with Appellant. [Assignment of error I.]. 2) The trial defense team was ineffective in providing the assistance of counsel. [Assignment of error V.]. 3) Lastly, the trial was rendered fundamentally unfair when evidence never introduced at trial was given to the President and at least one panel member during their deliberations on findings. [Assignment of error X.].

We will discuss these three assignments more fully, but first we will address the facts of this case.

## I.

## BACKGROUND

At the time of trial, Appellant was a 26 year-old, married Coast Guardsman assigned to a ship as it s sole health services technician. The record reflects that he was a well-respected member of the crew. Several character witnesses also attested to his outstanding performance during his prior shoreside assignments.

The most serious charges raised in this case involved the alleged rape and forcible sodomy on December 8, 1996, of LTJG B., a graduate of the Coast Guard Academy, who was on her first assignment. Initially assigned to the ship in June 1995, she supervised Appellant in his performance as a watch stander. He also assisted her in managing the ship s classified material account. At trial, LTJG B. recounted how in November 1995, after returning from liberty ashore, she had asked Appellant for some aspirin for a

headache. She testified that Appellant appeared intoxicated and that, while she was in sick bay alone with him, he grabbed her hand and asked for a kiss. When she refused, he said, "Come on, your roommate let me. Why don t you?" R. at 815. She testified that when she again refused, he wrapped his arms around her and held her tightly. After a brief struggle, he forcibly kissed her. LTJG B. testified that after Appellant kissed her, she was able to open the door and then he released her. When she returned to her stateroom, she told her roommate and friend, LTJG T.B., that she hated Appellant. However, she apparently said nothing further about the assault.

LTJG T.B. testified at trial that she had engaged in a consensual, sexual relationship with Appellant during the May-June 1995 timeframe, while she was still his direct supervisor. LTJG T.B. also testified that Appellant was never aggressive with her and that, even when intoxicated, he respected her wishes when she declined to have sex with him. Sometime in January 1996, LTJG T.B. commenced a sexual relationship with a Chief Petty Officer on the ship, which resulted in her receiving non-judicial punishment and being transferred ashore. Shortly thereafter, she resigned her commission and left the Service in order to maintain her relationship with this same Chief Petty Officer. LTJG B. knew about her roommate s relationship with the Chief Petty Officer and the consequences to LTJG T.B. s career that ensued from it. However, this testimony was not heard by the court members at trial, due to the ruling of the military judge that it was precluded by M.R.E. 412 and of minimal relevance.

In April 1996, LTJG B. commenced a sexual relationship with an enlisted crew-member from her ship, BM3 A. (an E-3 at the time). BM3 A. apparently departed to another unit on the West Coast in May 1996. However, this relationship was not uncovered until after the charges were preferred in this case and the defense requested transactional immunity for BM3 A. so that it might obtain his testimony. The convening authority refused that request and launched an investigation into LTJG B. s possible misconduct. LTJG B. subsequently admitted in writing that she had engaged in a romantic relationship with BM3 A. of a sexual nature, and she was awarded nonjudicial punishment in April 1997. However, none of this information was presented to the court members at trial.

LTJG B. did testify at trial that she had held parties at her apartment attended only by enlisted members of the crew and at which alcohol was served. Appellant had attended at least one of these parties at LTJG B. s apartment. However, the defense s attempts to elicit an admission that she had been photographed at one of these parties sitting in BM3 A. s lap as he lay in a hammock was precluded by the military judge.

During her testimony, LTJG B. also admitted to engaging in a social friendship with a female Petty Officer from the ship, FS3 L. LTJG B. regularly cooked meals for FS3 L. at LTJG B. s apartment, and had visited FS3 L. s home as well. When they were off the ship, they each addressed one another by their first names.

In April 1996, LTJG B. became the Operations Officer for the ship and, consequently, Appellant s Department Head. On the evening of December 7, 1996, LTJG B. attended the ship s Christmas party at a local restaurant. While there, she received a telephone call from Appellant who wanted permission to

be excused from duty the following day due to marital problems. After checking with the Executive Officer, LTJG B. testified that she told Appellant his request was granted and that he should see the Executive Officer after the weekend was over about whether he needed any further assistance such as not getting underway with the ship the following week.

After leaving the restaurant at approximately 2130, she and several other members of the crew went out together. She testified that she drank about five bottles of beer. They arrived back at her apartment at approximately 0230. After her friends departed, she called a female officer friend on the West Coast, LTJG Rumazza. At approximately 0300, there was a knock on her apartment door. LTJG B. testified that she could not see who was at her door, because the person outside had covered the peephole with a finger. LTJG B. testified that she opened the door without knowing who was there, and Appellant entered her apartment uninvited.

LTJG B. testified that Appellant appeared drunk and that he said he needed to talk to her about a personal problem. At this point, LTJG Rumazza was still on the telephone and curious about what a Petty Officer was doing in LTJG B. s apartment at that hour. LTJG B. briefly gave Appellant the telephone so that her friend could speak to him. LTJG Rumazza testified that Appellant sounded drunk and told her that he was having a rough day that he was trying to get the day off, because his wife was leaving him. While Appellant was conversing with her friend, LTJG B. testified that she got a plate of "crawdads" (crayfish) from her kitchen. After concluding her telephone call to LTJG Rumazza, LTJG B. sat in her living room eating the crawdads while she listened to Appellant tell her about his marital troubles.

After approximately 15 minutes of talking about his personal problems, Appellant commented about the mistletoe on her ceiling fan and asked LTJG B. for a kiss. She testified that, after she refused, he grabbed her wrist and pulled her out of her chair and wrapped his arms around her in a bear hug. He then forcibly kissed her, inserting his tongue into her mouth. After the kiss he said, "Now, that wasn t that bad, was it?" R. at 843. Her only response was to say, "Whatever, Doc." *Id.* Appellant then sat back onto the couch and she sat back down in her chair, where she said she continued to listen to Appellant talk about his marital problems. LTJG B. testified that after five more minutes he started asking her personal questions, such as why she wore a ring on her ring finger and about her boyfriend in California. She described her reaction to these questions as, "I felt violated. I felt  some guy is asking me about my personal life which I don t expose to anybody about [*sic*]." R. at 845. LTJG B. testified that, at approximately 0400, she put her plate of crawdads away and cleaned up around the kitchen. She then asked Appellant to leave. She said she tried to convince him to go elsewhere, but did not order him to leave. He repeatedly turned aside her suggestions of where else he could go. Finally she said, "F___ it. I m going to sleep." R. at 847.

LTJG B. testified that contrary to her usual practice, she left her front door unlocked, the lights on in her apartment, and closed the door to her bedroom. In her bedroom, she changed out of her jeans into shorts and then got into bed. A few minutes later, Appellant appeared by her bedside, naked. LTJG B. testified that she told Appellant to, "Get out and leave me alone." R. at 852. He nonetheless got into bed with her.

In her testimony, she described how she attempted to physically resist Appellant s sexual advances, while also telling him that she would not give in to him. However, according to LTJG B., Appellant overcame her resistance and penetrated her vagina, both digitally and with his tongue, as well as engaged in sexual intercourse.

When Appellant was asleep, LTJG B. said she slipped out of the bed at approximately 0530 and went to her patio where she rested in a hammock for two hours. Later, she left the apartment for several hours to go sit behind a nearby church where she said she cried for several hours. She testified that when she returned to her apartment at approximately 1230, Appellant was still there. However, she remained and read the morning newspaper while lying on the floor. After Appellant emerged from the bathroom, she got him an aspirin and water. They discussed the need for Appellant to talk to the Executive Officer on the ship about whether he would get underway with them that week. She testified that he grabbed her rear as she was lying on the floor and said, "Thanks, Ms. B." R. at 866. As he was leaving, she admonished him to not be seen by LTJG Borlase, another of the ship s officers who lived in the same apartment complex.

LTJG B. testified that, three days later, she confronted Appellant and threatened to turn him in if he ever touched another female crew-member. When she was cross-examined about this confrontation, the defense sought to elicit an admission from her that she had instead threatened Appellant by telling him, "I ll burn you just like I burned that guy at the Academy." R. at 911. The military judge ruled that the defense could not ask LTJG B. whether she had made this threat, an apparent reference to an incident involving an alleged sexual assault at the Academy when she was a cadet.

The day after the Christmas party, LTJG B. s Commanding Officer received an anonymous letter alleging that a female officer assigned to the unit, "Ms. B.," was engaging in inappropriate conduct with the enlisted crew. At the time there were only two female officers assigned to the ship, LTJG B. and an ENS Beaver. Both the Commanding Officer and the Executive Officer assumed that the letter was referring to LTJG B. On December 13, 1996, the Commanding Officer and the Executive Officer met with LTJG B., and questioned her regarding the allegations in the letter. LTJG B. admitted that she liked to go out and party and drink a lot, but she denied having inappropriate relationships with enlisted crew-members or attending enlisted crew parties. The Commanding Officer was apparently satisfied by her assurances, but he cautioned her to use more discretion on her liberty time. Following this meeting, LTJG B. advised her friend, FS3 L., that they needed to change their relationship with one another so that they would not get into trouble.

At trial, LTJG B. insisted that she was truthful in answering her Commanding Officer s questions. She explained her answer was a denial of *then* being involved in an inappropriate relationship with an enlisted member of the crew. Although she did not explain her rationale to the members, LTJG B. apparently considered the parties in her apartment to not constitute *crew parties*, although only crewmembers attended. LTJG B. also did not explain at trial how her answer was truthful in light of her ongoing fraternization with FS3 L.

Following this counseling session over the anonymous letter, LTJG B. was fearful for her career. LTJG B. spoke with several female crew-members about Appellant, inquiring whether he had done anything to them and threatening to take action if he laid a hand on any of the women. However, she did not mention Appellant s sexual assault on her to anyone else until January 20, 1997, when she told FS3 L. The next day she reported the incident to her Commanding Officer.

On January 23, 1997, Appellant was placed in pretrial confinement. During the ensuing investigation, the charges involving other female members of the crew surfaced. Those charges involved consensual sexual intercourse with three others, and offensive touchings involving LTJG B. s friend, FS3 L., and one other. Most of the charged offenses apparently occurred when he accosted female crew-members while intoxicated.

Prior to trial, the Government successfully limited the Defense from introducing evidence that Appellant had passed a polygraph examination administered by the Naval Criminal Investigative Service (NCIS). The NCIS examiner, who had conducted more than 2,000 examinations over 13 years, opined that Appellant was non-deceptive in answering all of the relevant questions and that Appellant believed LTJG B. had consented to sexual intercourse with him. However, prior to trial LTJG B. also passed a polygraph examination administered by a local law enforcement agency. The military judge ruled that the defense would not be allowed to present evidence concerning Appellant s polygraph examination.

## II.

### MILITARY RULE OF EVIDENCE 412

M.R.E. 412 bars evidence of other sexual behavior by an alleged victim of sexual misconduct, subject to several exceptions. The rule is derived from the Federal Rules of Evidence. Manual for Courts-Martial, United States (1995), App. 22 at A22-35. The rationale for the rule was to preclude the sort of degrading attacks on victims of sexual assault that had become commonplace over the years and which had the effect of discouraging reports of sexual assault. Before enactment of the so-called "rape shield" law amending the Federal Rules of Evidence, prior evidentiary rules allowed for wide-ranging inquiry into the private conduct of rape victims that had little, if any, connection to the events giving rise to the prosecution. *See U.S. v. Sanchez*, 44 M.J. 174, 178 (1996) (citing 124 Cong. Rec. 34912 (1978)). By barring the introduction of evidence that merely served to dredge up embarrassing information about a victim s sex life, Congress sought to protect rape victims from unwarranted invasions into their private lives. At the same time, in fashioning the rule, Congress sought to also preserve the ability of defendants to present a defense, as well as to protect society s interest in assuring fair trials. 124 Cong. Rec. at 34913. To accomplish this aim, Congress included several exceptions, including a provision allowing the introduction of evidence that would otherwise be excluded under the rule, if its exclusion would violate the Constitutional rights of the accused. M.R.E. 412 (b)(1)(C).

The rule is grounded on the general premise that a victim s consent to sexual relations with others does not generally support a supposition that the victim consented to sexual relations with the person accused

of a sexual assault. *U.S. v. Lauture*, 46 M.J. 794, 797 (Army Ct. Crim. App. 1997). However, this rule, by its own terms, only applies when there is an alleged victim of a nonconsensual sexual offense. M.R. E. 412. In this case, LTJG B. s former roommate testified concerning her consensual, sexual liaisons with Appellant that resulted in one of the specified charges of adultery. However, the military judge did not permit the defense to cross-examine LTJG T.B. concerning her voluntary, sexual relationship with another enlisted crew member nor the consequences that ensued from the Command s discovery of her misconduct. The defense was likewise not allowed to delve into LTJG B. s awareness of these acts by LTJG T.B. and their consequences to LTJG T.B. s career.

The military judge ruled that this information was protected under M.R.E. 412 and was of little relevance. In her ruling, the military judge determined that LTJG B. s former roommate was a victim within the meaning of the M.R.E. 412, apparently misconstruing the applicability of the rule to any sexual misconduct. The phrasing of M.R.E. 412 (a) does make reference to "alleged sexual misconduct", which seems to suggest that the rule might apply to any sexual misconduct, including adultery. However, as the title of the rule, itself, and subparagraph (e) make plain, the rule properly applies only to nonconsensual sexual misconduct.

The military judge s error in excluding this evidence prevented the fact-finders from hearing the testimony of LTJG B. s friend and former roommate that, under the defense s theory of the case, established why LTJG B. was fearful of the consequences to her career if the Command were to learn of a sexual dalliance with Appellant. According to the defense, LTJG B. s fear of discovery in the wake of the anonymous letter to her Commanding Officer was the motivation for her to lie about her encounter with Appellant during the early morning hours of December 8, 1996. The military judge s ruling also prevented the defense from cross-examining LTJG B. concerning her knowledge of LTJG T.B. s misconduct and its effect on LTJG T.B. s career. At the time of her counseling session with her Commanding Officer, LTJG B. was being considered for prestigious assignments to flight school or as the executive officer on another ship.

While not asserting that the military judge was correct in her determination that LTJG T.B. was a victim when she voluntarily engaged in a sexual relationship with a subordinate, the Government contends that the military judge acted within her discretion in limiting the cross-examination of LTJG T.B. The Government argues there was no need to bring in this evidence of the adverse consequences to an officer for fraternizing with an enlisted subordinate, because those consequences are well known. Furthermore, the Government argues that any error was harmless due to the irrelevance of the proffered testimony, and because the defense was able to cross-examine LTJG B. about her motives to fabricate her accusations. However, this is precisely the point the defense was not allowed to fully cross-examine the sole witness against Appellant on these most serious charges. The defense was not permitted to bring out key facts that supported its contention that LTJG B. was motivated by fear and self-interest in her claims that Appellant had raped and forcibly sodomized her.

When LTJG T.B. was discovered to be involved with an enlisted crew-member in January 1996, she was quickly transferred ashore and soon thereafter resigned from the Service. Based on her friend s

experience, LTJG B. would have been acutely aware of what would happen if she was discovered in a similar situation. The anonymous letter addressed to her Commanding Officer that accused her of drinking too much, partying with the crew, and (impliedly) bestowing sexual favors on yet another crew member identified as Doug, greatly increased the risk that her own transgressions might be discovered. Although she didn t know all of the details contained in the letter, LTJG B. had good reason to fear that her bright prospects for reassignment were suddenly in jeopardy. Given the timing of her counseling session with her Commanding Officer so soon after Appellant had spent the night in her apartment, she might quite naturally have concluded that the letter made allegations concerning Appellant. Fearful that an investigation of her might surface her prior crew parties and her relationship with the now-departed BM3 A., and concerned about what information might be revealed about the circumstances of Appellants  visit to her apartment, LTJG B. could have had powerful motivations to attempt to cast the events involving Appellant in a manner that shielded her from blame. These are facts that bear directly on LTJG B. s possible motivation to make false claims concerning Appellant. Yet, none of these facts were heard by the Court members.

Although the information concerning LTJG T.B. s discharge from the Service is just one piece of the overall picture, we believe that its exclusion seriously handicapped Appellant s defense. While every officer may be aware that fraternization is likely to be harmful to one s career, LTJG B. s credibility was absolutely crucial to the ultimate determination of guilt on the most serious charges in this case. This evidence concerning LTJG B. s motive to fabricate her accusations against Appellant was critical to Appellant s case.

At trial, the Government presented expert testimony that portrayed LTJG B. s actions as being consistent with the behavior of a person suffering from post traumatic stress syndrome, such as might be expected in a victim of rape. This supported the Government s perspective that LTJG B. was a young woman who was distraught and confused over how to react to an egregious assault in her own home. However, by excluding the evidence regarding her awareness of the consequences to her shipmate and friend following a consensual relationship with an enlisted crew-member, the Appellant was prevented from presenting a contrasting perspective concerning LTJG B. s actions. We have concluded that the military judge s erroneous ruling excluding this testimony infringed on Appellant s Constitutional right to present a defense. *See U.S. v. Sanchez* 44 M.J. at 179 (citing *U.S. v. Dorsey*, 16 M.J. 1, 4 (CMA 1983), and *Olden v. Kentucky*, 488 U.S. 227 (1988)).

We are also concerned by the military judge s rationale for precluding the cross-examination of LTJG B. concerning her own nonjudicial punishment for a prior sexual relationship with another enlisted crewmember. The military judge excluded this line of questioning under M.R.E. 412 and in her ruling observed that a nonjudicial punishment proceeding does not prove anything, impliedly suggesting that the determination that LTJG B. had engaged in the prior sexual misconduct was not reliably established. However, LTJG B. s nonjudicial punishment was grounded on her own written admission so there should have been no serious contention that the factual basis of the proceeding was not reliable. In addition, the military judge did not seem to give credence to the potential applicability of M.R.E. 412(b)(1)(C) to this issue. In ruling on the objection to this line of questioning, the vital interests of an accused being fairly

allowed to present a defense must be taken seriously. It is improper to prohibit the defense from attempting to cross-examine the prosecution s key witness concerning that witness  motivations to mislead. *See Sanchez, supra.*

Both LTJG B. and LTJG T.B. had demonstrated by their actions that they were willing to abandon their positions of leadership and to consort with enlisted subordinates on a basis of equality, including engaging in sexual liaisons. Those actions were both inimical to their status as officers and subjected them to criminal prosecution. Preventing the court members from hearing this evidence runs the risk of unfairly distorting the court members  understanding of the possible motivation of the Government s main witness against Appellant. While allowing this evidence would have perhaps been highly embarrassing to LTJG B., both personally and professionally, the consequences of an errant decision on these charges is infinitely more severe for Appellant. Our actions in this case should not be construed as necessarily subscribing to Appellant s theory of events. If that were so, we would set aside the findings of guilty pertaining to LTJG B. and order them dismissed. However, excluding from the court members critical information that supports Appellant s defense, raises fundamental concerns of fairness that mandate a rehearing.

When the prior sexual conduct of the victim establishes a motive to fabricate, that evidence may be Constitutionally-required to be admitted. *See U.S. v. Avery*, 52 M.J. ___ (CAAF April 14, 2000); *Sanchez at 179.* Balancing the conflicting interests embodied by M.R.E. 412 presents a most difficult challenge. In this case, we think M.R.E. 412(b)(1)(C) may require allowing the cross-examination of LTJG B. on her prior admission to a sexual relationship with BM3 A. from her ship. Given our action below, we do not decide the issue. However, the considerations enumerated herein should be carefully weighed should an evidentiary ruling on this issue be required at any future rehearing.

III.

INADEQUACY OF REPRESENTATION

With regard to the adequacy of the trial defense team s representation of Appellant, the Government argues that the actions of Appellant s military and civilian defense counsel meet the standard of *Strickland v. Washington*, 466 U.S. 668, 689 (1984). We agree.

This was clearly a hard fought case, presenting challenges for both sides. We re convinced that all counsel invested a great deal of effort into the trial. For the most part, the record reflects well on their efforts. The lapses of defense counsel, that in retrospect are troubling, do not result in a failure of representation under the Sixth Amendment standard. Although the defense was handicapped by several adverse evidentiary rulings, defense counsel was not foreclosed from making a forceful case based upon the evidence that was introduced. We are concerned over the defense counsels  failure to more vigorously explore the seeming incongruencies in LTJG B. s testimony. However, we are not inclined to second-guess the tactical decisions of Appellant s counsel.

In a supplemental brief, Appellant has further alleged that his counsel argued the appropriateness of a bad conduct discharge, contrary to his wishes. He also alleges that his counsel did not adequately prepare him to exercise his rights in presenting evidence in extenuation and mitigation, specifically by making an unsworn statement during the sentencing phase of the trial. We find that defense counsel s argument on sentence merely attempted to ameliorate the very high probability that the sentence would include a dishonorable discharge. This argument can fairly be construed to have urged the Court members to adjudge the lesser penalty if they were determined to impose a punitive discharge. Given the convictions in this case, defense counsel could not credibly argue that no punitive discharge would be appropriate. *U.S. v. Weikel*, 24 M.J. 666, 668 (A.F.Ct.Crim.App. 1987). We do not believe that counsel can fairly be held to have acted deficiently by realistically dealing with the prospects of a punitive discharge. However, resolving this allegation and Appellant s assertions concerning his preparation for making an unsworn statement involve communications with counsel that lie outside the record and would require additional fact-finding to fully resolve. In light of our action remanding this case for a new hearing, we see no need to conclusively decide this issue. Any deficiency in defense counsel s performance during the sentencing phase of this trial can be remedied at a rehearing.

In summary, although we are troubled by the instances of less-than-vigorous cross-examination mentioned above, we ve concluded that these mistakes, even when considered together, do not amount to such an egregious departure from professional standards as to have deprived Appellant of his right to counsel. Counsel are not held to a standard of perfection. *See Strickland, supra*. Based upon the record before us, we see no basis to conclude that Appellant s right to competent representation was not fully accorded here.

IV.

EVIDENCE NOT ADMITTED, BUT DELIVERED TO THE PANEL FOR ITS DELIBERATIONS

Appellant has also specified as error the inadvertent inclusion of two prosecution exhibits that were never admitted into evidence, Prosecution exhibit (for identification) 1 and Prosecution exhibit (for identification) 2. The first of these two exhibits was a resume for an expert witness engaged by the Government to contest the validity of the Appellant s polygraph by the Naval Criminal Investigative Service. The second was a sheet of paper with three sets of questions (the last question of the third set was crossed out) that focused on whether LTJG B. consented to Appellant s actions on December 8, 1996. The hypothetical questions were drafted apparently as a contrasting approach to Appellant s polygraph examination. Together with the expert s resume, these documents may have caused someone reading them to correctly infer that Appellant had been subjected to a polygraph test. However, we do not speculate as to what further impact such an inference might have on the court members deliberations.

The Government notes that the inclusion of these two documents never introduced into evidence with the exhibits sent to the panel was inadvertent. Moreover, they were only seen but not read by two

members of the panel. Applying a presumption that the panel followed the military judge s instructions, the Government argues there was no prejudice to Appellant. Alternatively, the Government contends that any prejudice was waived by the defense at trial. We agree with the latter contention.

The erroneous inclusion of these documents in the exhibits folder given to the panel was realized on the day following the panel s receipt of the folder. After the court closed for deliberation, the president of the panel alerted the bailiff that they had exhibits that they didn t believe they should have been given. The military judge immediately queried the panel regarding who had seen the documents. Both the president and at least one other member had noticed the improper exhibits, but stated that they had not read them. The military judge ordered the documents removed from the panel s exhibit folder and, after questioning the members regarding who saw the two exhibits, sent them back to their deliberations.

When asked to comment on this error, the defense counsel stated that, " I don t believe that there s a big problem here, your Honor." R. at 1303. The defense offered no further curative suggestions, nor did they seek a declaration of a mistrial. Although we are troubled by the potential for mischief due to this error, defense counsel s affirmative waiver resolves this issue. Additionally, we re convinced that this error could only have affected the charges involving LTJG B. Given our action on the specified charges involving LTJG B., even if relief were warranted on this assignment of error, no further remedial action would be necessary.

## V.

## OTHER CHARGES

Aside from the charges involving LTJG B., the Appellant was also convicted of a number of crimes involving four other persons. These maltreatment, assault, indecent assault, and adultery charges were of lesser gravity than the rape and forcible sodomy, but nonetheless significant violations in their own right. We have considered the danger that the panel may have been influenced by the cumulative impact of the litany of charges and the number of women brought as witnesses against Appellant. We are convinced that there was no improper "spillover" and that, even if all of the evidence the defense sought to introduce regarding LTJG B. s alleged motivation to lie had been before the fact-finders, they would have reached the same conclusions on the charges not involving LTJG B. Moreover, we are convinced that all of the approved charges involving persons other than LTJG B. are both legally and factually sufficient and that they should be affirmed.

## VI.

## CONCLUSION

In summary, this Court is agreed that Appellant s substantial rights were materially prejudiced by the military judge s failure to allow testimony that would have given the court members a more complete

understanding of LTJG B. s possible motivations in accusing the Appellant of sexual assault. While we acknowledge the importance of protecting victims of sexual crimes from needless embarrassment and malicious attacks on their character, M.R.E. 412 cannot be used to bar evidence that is Constitutionally required to allow an accused to fairly mount an effective defense. Nor does the rule shield a witness who is not a victim from the requirement to provide evidence that is relevant to a proceeding.

However, we find that this error did not affect any of the charges not involving LTJG B. We are convinced that the Appellant would have been convicted of those other offenses, even if he had been acquitted of the charges involving LTJG B. We have reviewed the record in accordance with Article 66, UCMJ, and have determined that the findings of guilty of Charge I, Specifications 1 and 2; Charge V, Specification 3 and 4; and Additional Charge II, Specifications 1, 3 and 4 are correct in law and fact, and, on the basis of the entire record, should be approved. Accordingly, those findings of guilty are affirmed. The findings of guilty of Charges II, III, and IV and their Specifications, and Specifications 1 and 2 of Charge V, along with the sentence, are set aside and a rehearing is ordered.

If the convening authority determines that it is impracticable to hold a rehearing on Charges II, III, and IV and their Specifications, and Specifications 1 and 2 of Charge V, he may dismiss those offenses and order a rehearing on the sentence alone. In any event, upon completion of the convening authority s action on the sentence, after a rehearing, the record will be returned to this Court for further review pursuant to Article 66, UCMJ.

Chief Judge BAUM and Judge Kantor concur.

---

For the Court,

//s//

James P. Magner
Clerk of the Court

---