State of Nebraska, appellee, v.
Curtis H. Lavalleur, appellant.
___ N.W.2d ___

Filed September 19, 2014.    No. S-13-821.

1. **Statutes.** Statutory interpretation presents a question of law.
2. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court resolves the question independently of the lower court's conclusion.
3. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.
4. **Evidence: Testimony: Words and Phrases.** In their ordinary meanings, "sexual behavior" refers to specific instances of conduct and "sexual predisposition" refers to more generalized evidence in the form of opinion or reputation testimony about what would often be referred to as "character."
5. **Sexual Misconduct: Evidence: Words and Phrases.** Evidence about the existence of a relationship between the complaining witness and a third party is not, by itself, evidence of "sexual behavior" or "sexual predisposition" under the rape shield statute.
6. **Evidence.** Relevancy requires only that the degree of probativeness be something more than nothing.
7. **Sexual Misconduct: Evidence: Appeal and Error.** The erroneous exclusion of evidence under Neb. Rev. Stat. § 27-412 (Cum. Supp. 2012) is subject to harmless error review.
8. **Trial: Juries: Verdicts: Appeal and Error.** Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.
9. **Criminal Law: Juries: Evidence: Appeal and Error.** In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.
10. **Trial: Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered was surely unattributable to the error.
11. **Constitutional Law: Criminal Law: Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clauses of the federal and state Constitutions do not forbid a retrial after prejudicial error in a criminal trial so long as the sum of all the evidence admitted, erroneously or not, is sufficient to sustain a guilty verdict.

12. **Appeal and Error.** An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal but likely to recur during further proceedings.
13. **Criminal Law: Jury Instructions.** If there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give this instruction to the jury in a criminal case.
14. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Lancaster County: Andrew R. Jacobsen, Judge. Reversed and remanded for a new trial.

Dennis R. Keefe, Lancaster County Public Defender, and Webb E. Bancroft for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## I. SUMMARY

Curtis H. Lavalleur appeals from his conviction for attempted first degree sexual assault. The district court ruled that the rape shield statute, Neb. Rev. Stat. § 27-412 (Cum. Supp. 2012), prohibited Lavalleur from introducing evidence that the complaining witness was in an intimate relationship with a third party. Lavalleur sought to cross-examine the complaining witness about the relationship to establish a motive to falsely report that she had not consented to sexual activities with Lavalleur. On appeal, Lavalleur argues that evidence of an intimate relationship, standing alone, is not within the scope of the rape shield statute. We agree. We reverse, and remand for a new trial.

## II. BACKGROUND

The complaining witness, M.J., testified that in August 2012, she was working at a used-car dealership at which Lavalleur was the assistant manager. They socialized outside

of work but were not intimate. Lavalleur said that in July 2012, he told M.J. that he was developing feelings for her and that if the feelings were not reciprocal, they should distance themselves. M.J. told him she wanted to just be friends.

On August 17, 2012, Lavalleur and M.J. planned to repossess a vehicle together but changed their minds because it was too risky. Sometime before midnight, M.J. discovered that she was locked out of her apartment and asked Lavalleur to pick her up. M.J. testified that she had smoked marijuana before calling Lavalleur and wanted to drink at his house.

Once at Lavalleur's residence, Lavalleur and M.J. went to the basement and drank alcoholic beverages made by Lavalleur in a blender. M.J. testified that she had about four drinks and was very tired but not drunk; she did not feel sick or dizzy. Lavalleur testified they played drinking games and flirted.

According to M.J., sometime before they were ready to retire, she asked Lavalleur not to make her sleep alone in the basement. He said that she could sleep on a bed in the basement and that he would sleep on a nearby couch. M.J. testified that she remembered getting into bed but that she then fell into a deep sleep. When she awoke the next morning, she was naked from the waist down and Lavalleur, similarly unclothed, was lying next to her. M.J. said she could not remember anything when she woke up. Some of M.J.'s testimony suggested that Lavalleur might have drugged her. For example, M.J. testified that she did not see him mix the drinks and knew that consuming four drinks would not have made her "blackout like that." Lavalleur said they were drinking from the same blender.

According to Lavalleur, when M.J. said she was tired, he started upstairs for bed but she asked him not to leave her alone. Encouraged, Lavalleur retrieved a blanket and lay next to her. M.J. was on her side, and Lavalleur was behind her. Lavalleur believed M.J. was awake because she thanked him when he gave her the blanket. Lavalleur testified that he caressed M.J.'s body and that she responded with moaning and heavy breathing. Lavalleur testified that M.J.'s shorts were unbuttoned and unzipped when he entered the bed and

that he took this as further encouragement. Lavalleur began to stimulate her genitalia with his fingers and, after she did not resist, removed her shorts. Lavalleur testified that her responsive movements aided him in removing her shorts. But, Lavalleur testified, when his penis touched her leg, M.J. moved her hand back and said "no." Lavalleur did not believe it was a "firm" no and began to stimulate her with his fingers again. Lavalleur testified that M.J. did not resist the digital penetration but that, when he tried to position himself for intercourse again, she firmly told him no. At that point, Lavalleur testified, he was discouraged and went to sleep. In a police interview played for the jury, however, Lavalleur said that he tried to have intercourse with M.J. two or three times after she said no.

In the morning, M.J. did not accuse Lavalleur of misconduct, talk to him about their nakedness, or try to call anyone. Lavalleur said that when his alarm went off, M.J. was sitting on the couch and he thought she was hung over. On the way to work, M.J.'s silence was uncomfortable, so Lavalleur asked whether she remembered the previous night. She said she did not, and he told her they did not have intercourse. M.J. agreed that Lavalleur had briefly talked about the incident and assured her that things had not gone too far.

An hour after she got to work, M.J. called her roommate to pick her up so she that could shower at her apartment. After they got back to the apartment, M.J. testified, she told her roommate what happened. She planned to "let it go," but her roommate encouraged her to report the incident.

About 11:30 a.m., M.J., who had not showered, went to the hospital and was examined for sexual assault evidence. M.J. gave a statement to a police officer summoned by hospital personnel that was consistent with the testimony above. She vaguely remembered saying "no" to Lavalleur but could not remember where he touched her. M.J. told the officer that Lavalleur had touched her but that "it wasn't a big deal."

At the hospital, M.J. began text messaging Lavalleur and she agreed to send controlled messages at the officer's suggestion. The messages sent by Lavalleur were generally

consistent with his testimony at trial. He admitted to digitally penetrating M.J. but denied penile penetration. In response to M.J.'s accusation that she was unconscious, Lavalleur replied that he thought she was "somewhat still awake" because she responded to his touch. Lavalleur's messages also expressed regret, including statements that he had become "the very thing i hate" and "didn't know [he] was capable of doing something like that." Lavalleur testified that he expressed remorse because M.J. was obviously upset and he wanted to placate rather than argue.

There was no sperm found on any of the vaginal swabs from the sexual assault collection kit. The kit also contained swabs from M.J.'s thighs, breasts, and neck. Lavalleur was a weak contributor to a DNA sample from the swab of M.J.'s right thigh. The forensic scientist who tested the swab of M.J.'s right thigh testified that the DNA sample was not semen and that its source may be other bodily fluid or skin cells.

The State charged Lavalleur with first degree sexual assault and attempted first degree sexual assault. Before trial, the State moved in limine to exclude evidence of M.J.'s past sexual behavior and Lavalleur filed a notice of his intent to offer evidence under § 27-412. At the pretrial hearing, Lavalleur explained that he wanted to show that M.J. had an intimate relationship with a third party with whom she had a fight on August 17, 2012. Lavalleur argued that the relationship showed that M.J. had a motive to falsely report a sexual assault. Lavalleur stated that he would not question M.J. about her sexual conduct but might ask whether the relationship was intimate.

The district court excluded evidence of M.J.'s relationship with the third party under § 27-412. In response to Lavalleur's argument that the exclusion violated his confrontation rights, the court stated that the relationship was relevant only if M.J. had a need to conceal or explain her whereabouts on the night of August 17, 2012. The court reasoned that unless M.J.'s partner was aware that M.J. had spent the night with Lavalleur when M.J. first reported the assault, the relationship was irrelevant.

At trial, defense counsel made an offer of proof out of the jury's presence by questioning M.J. about her relationship with a woman who was not her roommate. M.J. admitted that she was involved with a woman named "Sable" and that they had a fight on August 17, 2012, and were still fighting when M.J. went to Lavalleur's house. M.J. testified that she called Lavalleur to pick her up because Sable would not answer her telephone. Sable visited M.J. at the hospital, and M.J. told her that she had awoke without pants and suspected that something happened.

The jury found Lavalleur not guilty of first degree sexual assault but guilty of attempted first degree sexual assault, which is a Class III felony. The court sentenced Lavalleur to imprisonment for 24 to 36 months.

## III. ASSIGNMENTS OF ERROR

Lavalleur assigns, restated, that the court erred by (1) prohibiting evidence of M.J.'s relationship with a third party; (2) failing to properly instruct the jury on attempted first degree sexual assault; and (3) imposing an excessive sentence. Lavalleur also assigns that (4) he was denied effective assistance of counsel and (5) the evidence was insufficient to sustain his conviction for attempted first degree sexual assault.

## IV. STANDARD OF REVIEW

[1,2] Statutory interpretation presents a question of law.[1] When reviewing questions of law, an appellate court resolves the question independently of the lower court's conclusion.[2]

[3] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[3]

---

[1] *Underwood v. State Patrol*, 287 Neb. 204, 842 N.W.2d 57 (2014).

[2] See *id*.

[3] *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014).

## V. ANALYSIS

### 1. EVIDENCE OF M.J.'S RELATIONSHIP WITH A THIRD PARTY

Lavalleur argues that the court erred by excluding evidence of a romantic relationship between M.J. and another woman under the rape shield statute. Lavalleur contends that the testimony he sought to elicit from M.J. established a motive to fabricate and was not evidence of her past sexual behavior or sexual predisposition. The State argues that the rape shield statute bars the admission of the testimony and that the testimony is irrelevant unless M.J.'s girlfriend knew M.J. had spent the night at Lavalleur's house when M.J. first reported a sexual assault. We conclude that the rape shield statute does not bar evidence of M.J.'s relationship with another woman, that it is relevant to her credibility, and that its exclusion was not harmless.

#### (a) Rape Shield Statute

Nebraska's rape shield statute is codified in the Nebraska rules of evidence. Subject to several exceptions, § 27-412(1) bars "[e]vidence offered to prove that any victim engaged in other sexual behavior" and "[e]vidence offered to prove any victim's sexual predisposition" in civil or criminal proceedings involving sexual misconduct. Before 2010,[4] the rape shield statute was codified at Neb. Rev. Stat. § 28-321 (Reissue 2008) and generally prohibited evidence of the complaining witness' "past sexual behavior" in sexual assault cases.

We recognized two purposes of the previous rape shield statute which we also find applicable to § 27-412. First, the statute protects rape victims from grueling cross-examination about their past sexual behavior or sexual predisposition that too often yields testimony of questionable relevance.[5] Second, the rape shield statute prevents the use of evidence of the complaining witness' past sexual conduct with third parties or sexual predisposition from which to infer consent or undermine

---

[4] 2009 Neb. Laws, L.B. 97, § 3.

[5] See *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999).

the witness' credibility.[6] The rape shield statute is not meant to prevent defendants from presenting relevant evidence, but to deprive them of the opportunity to harass and humiliate the complaining witness and divert the jury's attention to irrelevant matters.[7] We note that, like its predecessor,[8] § 27-412 is patterned after its counterpart in the Federal Rules of Evidence.[9] The advisory committee notes to Fed. R. Evid. 412, the federal rape shield rule, explain that the rule "aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process."[10]

The problems rape shield statutes were meant to address are well established. Traditionally, courts often admitted evidence of a complaining witness' prior sexual activity as relevant to consent and credibility.[11] As one court explained, the rationale was that "'[n]o impartial mind can resist the conclusion that a female who has been in the recent habit of illicit intercourse with others will not be so likely to resist as one who is spotless and pure.'"[12] Fear of a courtroom inquisition into their sexual activities led many victims to forgo reporting sexual assaults altogether.[13] Evidence of the complaining witness' sexual history was usually of little probative value and was instead aimed to inflame "nebulous notions of unchastity, impurity, and immorality."[14]

Lavalleur's attorney described the testimony he sought to elicit from M.J. at a pretrial hearing and in an offer of proof

---

[6] See *State v. Sanchez-Lahora*, 261 Neb. 192, 622 N.W.2d 612 (2001).

[7] *State v. Schenck*, 222 Neb. 523, 384 N.W.2d 642 (1986).

[8] *State v. Sanchez-Lahora, supra* note 6.

[9] Compare § 27-412(1) with Fed. R. Evid. 412(a).

[10] Fed. R. Evid. 412, advisory committee notes on 1994 amendment.

[11] *State v. Hopkins*, 221 Neb. 367, 377 N.W.2d 110 (1985).

[12] *Id.* at 372, 377 N.W.2d at 114, quoting *Lee v. State*, 132 Tenn. 655, 179 S.W. 145 (1915).

[13] See *State v. Hopkins, supra* note 11.

[14] *Id.* at 373, 377 N.W.2d at 115.

made during trial. In response to the State's motion in limine, Lavalleur's counsel explained:

> I want to be able to talk about this particular young lady who is involved in a relationship with someone else and that on the night this happened, they were in a fight and that they had broken up and now she ends up over at . . . Lavalleur's house that — as a way of why she would maybe make a false report, as to her credibility or as to her bias.

The offer of proof made at trial was consistent with this purpose:

> [Defense counsel:] [O]n August 17, 2012, you were involved in a relationship, right?
>
> [M.J.:] Correct.
>
> Q. And that was with who?
>
> A. Sable.
>
> Q. And on that particular day, were you and — had a fight with Sable?
>
> A. Yes.
>
> Q. Okay. And were you still fighting with her that night when you went to . . . Lavalleur's?
>
> A. Yes.
>
> Q. And that was one of the reasons that you called . . . Lavalleur is because not only was [your roommate] not answering her phone but Sable wasn't answering her phone to help you out, too, right?
>
> A. Correct.
>
> . . . .
>
> Q. Now, the next day when you went to the hospital, you said you had some friends — you had to call a friend to come down, is that right?
>
> A. That's right.
>
> Q. Was it Sable that came down?
>
> A. Yes.
>
> . . . .
>
> Q. When did she learn about what happened?
>
> A. When she had gotten there.
>
> . . . .

Q. . . . [D]id you discuss fully with Sable what — what you knew at that point?

. . . .

A. I didn't tell her the details of it until later that night, but she knew basically why I was there.

Q. Did you tell her you were at — that you went — had fallen asleep at . . . Lavalleur's house, and you woke up with your pants off?

A. Correct.

Q. Did you tell her you suspected something happened?

A. Yes.

In response to questioning from the court, Lavalleur's counsel stated that he would not cross-examine M.J. about her sexual conduct with Sable, but that he might ask whether the relationship was intimate.

[4,5] We conclude that M.J.'s relationship with Sable was not evidence of "sexual behavior" or "sexual predisposition." Thus, the court erred in prohibiting Lavalleur from cross-examining M.J. about the relationship under § 27-412(1). In their ordinary meanings, "'sexual behavior' refers to specific instances of conduct and 'sexual predisposition' refers to more generalized evidence in the form of opinion or reputation testimony about what we would often call 'character.'"[15] Questioning about the existence of a relationship between the complaining witness and a third party does not, by itself, implicate either form of evidence regulated by § 27-412:

> If questioning about this subject were to lead to evidence or questions about details of particular acts, encounters, or practices, then such evidence and quests are indeed covered by rape shield legislation . . . . On the other hand, it seems equally clear that *the fact* that the complaining witness is in an ongoing relationship, particularly if it entails living together, an engagement, or some other form of commitment, would not ordinarily be described as sexual conduct even if the relationship involves ongoing

---

[15] 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:78 at 256 (4th ed. 2013).

> sexual intimacy. Ordinary notions of privacy would not be offended by questions or evidence disclosing such relationships and some routine details, such as how often the people see each other or how long they have lived together, and even the basic question whether the relationship includes sexual intimacy.[16]

The testimony Lavalleur sought from M.J. did not stray into the sexual acts performed with her partner. Nor was it an appeal to the jurors' sexual mores or an attempt to inflame perceived prejudices. Lavalleur sought to establish that M.J. had a motive to falsify her accounting of the events of August 17, 2012. Her relationship with Sable and the strength of their bond—including whether they were intimate—are relevant to M.J.'s motivation to report a sexual assault. Her testimony would not amount to proof of her sexual behavior, involve a "propensity inference based on sexual acts," or be a "significant invasion of [her] personal privacy."[17]

The potential for the jury to infer that M.J. has engaged in sexual acts does not bring evidence of her relationship with Sable within § 27-412. Evidence is not barred by the rape shield statute "simply because it might indirectly cause the finder of fact to make an inference concerning the victim's prior sexual conduct."[18] The jury could have drawn similar inferences from M.J.'s marital status and the existence of her daughter, to which she testified on cross-examination without objection.

The Georgia Supreme Court reached a similar conclusion in *Richardson v. State*.[19] The defendant in *Richardson* was convicted of rape and kidnapping with bodily injury. He admitted that he had sexual contact with the complaining witness but claimed it was consensual. During cross-examination of the complaining witness, the defense sought to inquire about her relationship with a former boyfriend. The witness had

---

[16] *Id.* at 263-64 (emphasis in original).

[17] See *id.* at 264.

[18] *People v. Cobb*, 962 P.2d 944, 951 (Colo. 1998).

[19] *Richardson v. State*, 276 Ga. 639, 581 S.E.2d 528 (2003).

been wearing a jacket belonging to her ex-boyfriend during the alleged sexual assault, and the jacket had become stained with blood and semen. The defendant theorized that the complaining witness fabricated the sexual assault to account for the stains and rekindle the relationship with her former boyfriend. The trial judge refused to permit questioning about the relationship under Georgia's rape shield statute, which generally prohibited evidence "'relating to the past sexual behavior of the complaining witness . . . .'"[20]

The Georgia Supreme Court reversed, concluding that questioning about the existence of the complaining witness' prior relationship with a third party was not evidence of past sexual behavior. Furthermore, "[e]vidence merely that the [complaining witness] has or had a romantic relationship with another man" did not amount to character evidence.[21] As long as the defendant "confined his questioning to the non-sexual nature of the [complaining witness'] former relationships," the rape shield statute was not a bar to admissibility.[22] As to the defendant's theory of relevance, the court acknowledged that the complaining witness "was not compelled to return the stained jacket and had other options."[23] But the fact that she could have simply thrown the jacket away went to the strength of the defendant's theory and involved "credibility determinations . . . properly left to the jury."[24]

In another analogous case, the Colorado Court of Appeals reversed the exclusion of evidence under a rape shield statute in *People v. Golden*.[25] According to the prosecution, the female complaining witness lived with two men and another woman in a rental house managed by the defendant. The defendant went to the residence and asked the complaining witness to accompany him in his vehicle for the purpose of signing a lease.

---

[20] *Id*. at 640, 581 S.E.2d at 529.

[21] *Id*.

[22] *Id*.

[23] *Id*. at 641, 581 S.E.2d at 530.

[24] *Id*.

[25] *People v. Golden*, 140 P.3d 1 (Colo. App. 2005).

While in the vehicle, the prosecution claimed, the defendant sexually assaulted her and then dropped her off at the rental unit. The defendant claimed the intercourse was consensual. When the complaining witness entered her house, she collapsed and told her roommates that the defendant had assaulted her. At trial, the defendant sought to cross-examine her about a "committed romantic relationship" with her female roommate to establish a motive to lie about whether she had consented to intercourse.[26] The trial judge refused to permit the line of questioning under Colorado's rape shield statute, which generally prohibited "[e]vidence of specific instances," "opinion evidence," and "reputation evidence" of the complaining witness' "sexual conduct."[27]

The appellate court reversed, holding that cross-examination about the complaining witness' intimate relationship with her roommate was not evidence of sexual conduct. The court "recognize[d] that a 'committed romantic relationship' between adults may be generally understood to have a sexual component, [but] the initial questions did not, standing alone, inquire into that component or any sexual conduct."[28] Instead of subjecting the complaining witness to a "fishing expedition into her past sexual conduct," the evidence sought to be elicited "called into question her credibility and her possible motive in telling her roommates that she had been sexually assaulted."[29] The potential for the jury to draw inferences about her past sexual conduct did not mandate exclusion under the rape shield statute.

We similarly conclude that Lavalleur's intended cross-examination of M.J. would not have amounted to a prohibited fishing expedition. Evidence of M.J.'s relationship with Sable is not within the ordinary meanings of "sexual behavior" or "sexual predisposition" and does not implicate the purposes for which § 27-412 was enacted. Thus, we turn to

---

[26] *Id.* at 3.

[27] *Id.* (emphasis omitted).

[28] *Id.* at 5.

[29] *Id.* at 6.

whether the evidence was relevant and whether its exclusion was harmless.

### (b) M.J.'s Relationship
### Was Relevant

In concluding that the rape shield statute barred evidence of M.J.'s relationship with Sable, the court indicated that it was irrelevant. It stated that Lavalleur could not adduce evidence of the relationship until he could "show that [M.J.] had some need to cover or to explain her whereabouts or whom she was with at the time she made the report." The court reasoned that M.J. did not have a motive to fabricate unless, at the time she made the report, Sable was aware that M.J. had spent the night at Lavalleur's house. We disagree.

[6] Relevancy is governed by Neb. Rev. Stat. § 27-401 (Reissue 2008). Under § 27-401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The bar set by § 27-401 is not a high one. Relevancy requires only that the degree of probativeness be something more than nothing.[30]

We cannot say that the probativeness of M.J. and Sable's relationship amounted to nothing. It is not improbable that M.J.'s absence from her apartment on the night of August 17, 2012, was noticed and that she would eventually have to explain her whereabouts to Sable. A report of sexual assault would have helped dispel any air of infidelity. While it would make Lavalleur's case stronger if Sable confronted M.J. before M.J. reported the sexual assault, the absence of this circumstance does not wholly strip the relationship of probative value. Whether Lavalleur's theory was credible is for the jury.

### (c) Exclusion of the Evidence
### Was Not Harmless

[7-10] The erroneous exclusion of evidence of M.J.'s relationship with Sable under § 27-412 is subject to harmless

---

[30] *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

error review. Errors, other than structural errors, which occur within the trial and sentencing process, are subject to harmless error review.[31] Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.[32] In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.[33] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered was surely unattributable to the error.[34]

The State has not demonstrated that the exclusion of evidence about M.J.'s relationship with Sable was harmless beyond a reasonable doubt. Two considerations lead us to this conclusion. First, M.J.'s testimony, and therefore credibility, was crucial to the State's case.[35] No other witness for the State was present in Lavalleur's basement on the night of August 17, 2012. The importance of M.J.'s testimony was heightened by the paucity of physical evidence. What little physical evidence the State produced was consistent with Lavalleur's version of events. Second, the State's case against Lavalleur was not overwhelming.[36] M.J.'s memory of what occurred after she got into bed was very limited, and Lavalleur testified that he acted only on the belief that M.J. had given consent. We also note that to acquit Lavalleur of the sexual assault charge, the jury necessarily found that M.J. consented to digital penetration.

---

[31] *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013).

[32] *Id*.

[33] *Id*.

[34] *Id*.

[35] See *Olden v. Kentucky*, 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988).

[36] See *id*.

## 2. Sufficiency of the Evidence

[11] Lavalleur argues that the evidence was insufficient to support his conviction for attempted first degree sexual assault. Our conclusion that the district court's exclusion of evidence under § 27-412 was erroneous and prejudicial requires us to determine whether retrial is permitted. The Double Jeopardy Clauses of the federal and state Constitutions do not forbid a retrial after prejudicial error in a criminal trial so long as the sum of all the evidence admitted, erroneously or not, is sufficient to sustain a guilty verdict.[37]

Though the evidence was not overwhelming, it is sufficient evidence to support Lavalleur's conviction for attempted sexual assault. Lavalleur testified that M.J. said "no"—or made a sound that the jury could interpret as "no"—after the first time he tried to initiate penile penetration. Lavalleur testified that, despite registering M.J.'s disapproval, he made a second effort to penetrate M.J. with his penis. Four days after the incident, Lavalleur told a police investigator that he tried again "two or three times" after M.J. expressed her lack of consent. From this evidence, the jury could infer that, before aborting his subsequent attempts to penetrate M.J. with his penis, Lavalleur developed an intent to penetrate M.J. without her consent or at a time when she was incapable of resisting or appraising the nature of her conduct.

## 3. Jury Instructions

[12] Though we need not reach Lavalleur's assignment that the jury instruction for attempted first degree sexual assault was erroneous, we address the issue because it is likely to recur on remand. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal but likely to recur during further proceedings.[38]

To convict Lavalleur of first degree sexual assault, the State had to prove that he subjected M.J. to sexual penetration without her consent or when he knew or should have known that M.J. was "mentally or physically incapable of

---

[37] See *State v. Pangborn, supra* note 31.

[38] *State v. Edwards*, 286 Neb. 404, 837 N.W.2d 81 (2013).

resisting or appraising the nature of . . . her conduct."[39] The criminal attempt statute, Neb. Rev. Stat. § 28-201 (Cum. Supp. 2012), required the State to prove that Lavalleur "[i]ntentionally engage[d] in conduct which, under the circumstances as he . . . believe[d] them to be, constitute[d] a substantial step in a course of conduct intended to culminate in his . . . commission of the crime." Section 28-201(3) provides that conduct is not a substantial step "unless it is strongly corroborative of the defendant's criminal intent." So, to find Lavalleur guilty of attempted first degree sexual assault, the jury had to find that he intended to subject M.J. to penetration either without her consent or when she was incapable of resisting or appraising the nature of her conduct, and that Lavalleur took a substantial step that strongly corroborated this intent.

Instruction No. 4, which the court gave the jury for the charge of attempted first degree sexual assault, failed to adequately describe the proof needed for conviction:

> The elements which the state must prove beyond a reasonable doubt in order to convict . . . Lavalleur of attempted first degree sexual assault are:
>
> 1. . . . Lavalleur intended to subject [M.J.] to sexual penetration; and
>
> 2. . . . Lavalleur intentionally engaged in a substantial step in a courseof [sic] conduct intended to culminate in subjecting [M.J.] to sexual penetration; and
>
> 3. [M.J.] did not give her consent; and
>
> 4. . . . Lavalleur did so on, about, or between August 17, 2012, and August 18, 2012, in Lancaster County, Nebraska.

This instruction is flawed in two respects. First, it fails to state that the substantial step must strongly corroborate Lavalleur's criminal intent. Second, the statement that one of the "elements" of attempted first degree sexual assault is that Lavalleur intended to subject M.J. to sexual penetration might cause confusion about the requisite state of mind. The State has to prove not only that Lavalleur intended to subject M.J. to sexual penetration, but also that he intended to do so without

---

[39] Neb. Rev. Stat. § 28-319(1) (Reissue 2008).

her consent or when she was incapable of resisting or appraising the nature of her conduct.[40]

[13] We note that the Nebraska Jury Instructions include an instruction for criminal attempt.[41] If there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give this instruction to the jury in a criminal case.[42]

## 4. REMAINING ASSIGNMENTS
### OF ERROR

[14] Because we conclude that the exclusion of evidence of M.J.'s relationship with Sable requires a new trial, we do not reach Lavalleur's remaining assignments of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[43]

## VI. CONCLUSION

We conclude that evidence of M.J.'s relationship with another woman was not barred by the rape shield statute. Cross-examination about the existence of an intimate relationship does not, standing alone, amount to evidence of "sexual behavior" or "sexual predisposition." Furthermore, the relationship was relevant even if M.J.'s girlfriend was not yet aware that M.J. spent the night at Lavalleur's house at the time M.J. reported a sexual assault. The exclusion of evidence was not harmless considering the importance of M.J.'s testimony to the State's case and the lack of overwhelming evidence against Lavalleur. But, though the evidence was not overwhelming, it was sufficient to support Lavalleur's conviction. Accordingly, we reverse Lavalleur's conviction for attempted first degree sexual assault and remand the cause for a new trial on that charge.

REVERSED AND REMANDED FOR A NEW TRIAL.

---

[40] See, §§ 28-201(1)(b) and 28-319(1)(b); 2 Wayne R. LaFave, Substantive Criminal Law § 11.3(a) (2d ed. 2003).

[41] NJI2d Crim. 3.3.

[42] See *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011).

[43] *Lang v. Howard County*, 287 Neb. 66, 840 N.W.2d 876 (2013).